Robert **RICHARDS**, Jr., a minor, by his father and next friend, Mr. Robert Richards

v.

Roger **THURSTON**, as Principal of Marlboro High School.

Civ. A. No. 69–993.

United States District Court
D. Massachusetts.

Sept. 23, 1969.

Supplementary Opinion Sept. 29, 1969.

Second Supplementary Opinion
Oct. 3, 1969.

Third Supplementary Opinion Oct. 6, 1969.

5. 28 U.S.C. § 1332.

450

Daniel D. Levenson, Boston, Mass., for plaintiff.

William J. Brennan, City Sol., Marlborough, Mass., for defendant.

## OPINION

WYZANSKI, Chief Judge.

Plaintiff, 17 years old, by his next friend, his father, has filed in the United States District Court, against the principal of the Marlboro High School, a comprehensive general high school, a complaint seeking restoration to his status as a member of the senior class there. He alleges that the defendant principal suspended him on the sole ground that he refused to have his hair, which he wears in a style reminiscent of the English singers called "The Beatles", and in a tidy style that Albert Einstein as scholar or master rarely displayed, cut to an extent approved by the principal. Plaintiff contends that he has a cause of action under the Civil Rights Act, 42 U.S.C. Sec. 1983, and under the Fourteenth Amendment to the United States Constitution. He claims that the Court has jurisdiction under 28 U.S.C. Sec. 1343(3).

There is no evidence that a formal written regulation of any school authority sets the maximum length or other aspects of a student's hairdress. Nor has any party shown any reason for the principal's official act except possibly the principal's personal prejudice, the community conventions of the first half of the Twentieth Century, and the views of some contemporaries, who may or may not be a majority of Marlboro's population, or of its parents, or of its students.

No factual foundation has been offered to show that plaintiff's hair style involves a health or sanitary risk to him or to others, or will interfere with plaintiff's or with others' performance of their school work, or will create disciplinary problems of a kind reasonably thought to be a concern of public officials.

This Court takes judicial notice that hairstyles have altered from time to time throughout the ages. Samson's locks symbolically signified his virility. Many of the Founding Fathers of this country wore wigs. President Lincoln grew a beard at the suggestion of a juvenile female admirer. Chief Justice Hughes' beard furnished the model for the frieze over the portico of the Supreme Court of the United States proclaiming "equal justice under law." Today many of both the younger and the older generations have avoided the increased cost of barbering by allowing their locks or burnsides to grow to greater lengths than when a haircut cost a quarter of a dollar.

Whether hair styles be regarded as evidence of conformity or of individuality, they are one of the most visible examples of personality. This is what every woman has always known. And so have many men, without the aid of an anthropologist, behavioral scientist, psychiatrist, or practitioner of any of the fine arts or black arts.

The Commonwealth of Massachusetts, at least since the desuetude of the Puritans' blue laws, has not attempted to regulate hair styles.

Massachusetts G.L. c. 76, which governs school attendance, and cognate provisions of Massachusetts law do not include any clauses regarding hirsute adornment.

But it may be argued that the principals of public schools are free to set their own standards for their own pupils, especially because the laws of the Commonwealth do not purport to require attendance at *public* schools but, on the contrary, merely create an opportunity, and leave every minor child, such as plaintiff, (or, more accurately, his parents, as his natural guardians,) free to choose a private school more to his taste.

The contention, in effect, is that inasmuch as plaintiff chose, without being required to do so, to attend the particular institution called the Marlboro High

School he voluntarily became subject to the prejudices of its governing authorities and has no right to set his own terms and no standing to complain of an official direction that he can avoid by going to some other school. Such an argument might seek support in McAuliffe v. City of New Bedford, 155 Mass. 216, p. 220, 29 N.E. 517, a case where local authorities dismissed a policeman because of his political activities and Justice Oliver Wendell Holmes, Jr., wrote for the state court an opinion denying the policeman's claim for a reinstatement on the ground that "The petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman."

However, recent decisions about public school teachers (see the cases beginning with Garner v. Board of Public Works of City of Los Angeles, 341 U.S. 716, 71 S.Ct. 909, 95 L.Ed. 1317 and culminating in Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629) and about civil servants generally (see United Public Workers v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed 754) indicate that Holmes, J.'s epigram somewhat simplified the problem.

■ The current view is that a state has not upon an arbitrary basis an absolutely unlimited right to refuse, opportunities such as education in the public schools, or employment in the public service. Often this, in somewhat circular terms, is referred to as the principle that there is a distinction between constitutional and unconstitutional conditions. At other times, this is said to present the problem of weighing the state's claims or interests against the individual's claims or interests.

Order can be defined properly only in terms of the liberties for which it exists, as liberty can be defined properly only in terms of the ordered society in which it thrives. As Albert Camus implied in *The Rebel,* order and liberty must find their limits in each other.

■■ Whatever be the formulation of the governing principles under our

Constitution, the duty of a court is to give scope to the state's claims of order, organization, and public purposes, yet not to allow such claims to prevail over individual liberty in the absence of a demonstrated rationality in the state's claims. Merely arbitrary choices of states or their official representatives cannot be enforced against any individual's serious claims of liberty. This is as true of minors as it is of adults. Tinker v. Des Moines School Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731; Griffin v. Tatum, (M.D.Ala.) 300 F.Supp. 60, 64. And when the personal liberty claimed by a minor or an adult has a high order of importance the state must make a strong showing of the need of its curtailment. United States v. O'Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672.

Clear illustration of this approach is given by the decision in West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628. There a public school authority sought to make attendance contingent upon a pupil saluting the American flag. A student whose religious faith precluded a flag salute was held to have a right to have the school authorities enjoined from enforcing its demand upon him.

It is the flag salute case rather than the City of New Bedford case which supplies the precedent which today has the greater relevance to this case. To be sure, plaintiff's claimed liberty to appear as he wills is not so significant as a Jehovah's Witness' claimed liberty to worship as he wills. But a principal's personal prejudice against the long hair of his pupils is not so significant as a state's claim to indoctrinate students by such patriotic symbolism as may inhere in saluting the American flag.

■ In summary, the state in the case now at bar has no such rational ground for dictating hair style to a pupil in a general high school as to support an official order interfering with his liberty to express in his own way his preference as to whatever hair style

comports with his personality and his search for his own identity.

Plaintiff's claim to liberty as to his appearance is entitled to protection from action by the state or its agents both under the broad terms of the "due process" clause of the Fourteenth Amendment (see Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510) and under the specific provisions of the Civil Rights Act which treat that claim to liberty as a civil right, 42 U.S.C. Sec. 1983, and give to the United States District Courts jurisdiction to enforce that right against an interfering agent seeking to exercise state authority. 28 U.S.C. Sec. 1343(3).

Nothing herein refers to the problems which might arise not in a general high school but in a school or other educational institution having a military or like disciplinary character. Arguably, uniformity may have some substantive merit in such specialized training establishments where individual liberty may need to be weighed against other rational, legitimate objects of a peculiar applicability. See Breen v. Kahl, W.D. Wis., 296 F.Supp. 702, 708.

But in schools of general comprehensiveness the constitutional premise is that "from different tones comes the best tune." Heraclitus frag. 8; Jaeger Paideia (1939) I, 18. They illustrate our national motto E PLURIBUS UNUM.

This Court's opinion is consistent with opinions of three other United States District Courts. Those are by Johnson, C. J. of the Middle District of Alabama in Griffin v. Tatum, 300 F.Supp. 60 (which at p. 62 states that "the Constitution protects the freedoms to determine one's own hair style and otherwise to govern one's personal appearance."), by James E. Doyle, D. J. of the Western District of Wisconsin in Breen v. Kahl, 296 F.Supp. 702 (which at pp. 705–706 declares that with respect to adults, "freedom to wear one's hair at a certain length or to wear a beard is constitutionally protected, even though it expresses nothing but individual taste", and that "the freedom of an adult male or female to present himself or herself physically to the world in the manner of his or her choice is a highly protected freedom" and that a like freedom exists for minor students unless the school authorities bear, as it said at p. 709, "a substantial burden of justification"), and by Lynne, C. J. in the Northern District of Alabama in Zachry v. Brown, 299 F.Supp. 1360 (which, referring to the equal protection clause of the Fourteenth Amendment, holds that the classification of male students "by their hair style is unreasonable and fails to pass constitutional muster.")

Some federal courts which look in a contrary direction are cited in Breen v. Kahl, 296 F.Supp. 702, 708. The only court of appeals decision, Ferrell v. Dallas Independent School District, 392 F.2d 697 (5th Cir.) concludes that hair style is not a civil right protected by the First or the Fourteenth Amendment. However, that judgment in Ferrell loses much weight because of the dissent of Tuttle, C. J.

Leonard v. School Committee of Attleboro, 349 Mass. 704, 212 N.E.2d 468, 14 A.L.R.3d 1192, while an opinion of the full court by Spalding, J., is merely an interpretation of Massachusetts statutory and common law and does not reach questions presented by the United States Constitution or federal statutes.

Plaintiff is entitled to a decree (1) that he be reinstated forthwith as a student in good standing in the Marlboro High School with the same rights, privileges, and immunities as those he had before his suspension, (2) that there be expunged from that school's records any notation of the suspension against which he complained and of the absences due thereto, (3) that defendant be enjoined from suspending or disciplining him on account of his hair style, and (4) that plaintiff recover his costs.

## SUPPLEMENTARY OPINION

I have received so many approving and disapproving comments which misunderstood the thrust of my opinion

filed September 23 in this case that I deem it appropriate to file this supplemental opinion.

1. The object of the opinion was to shoot like a rifle at the parties' target and not like a cannon at a public issue.

2. With that object in mind, the opinion carefully noted that in this case there was no applicable Massachusetts statute and there was no formal school regulation with respect to hair styles.

3. The opinion emphasized that no factual foundation had been laid to show that there was in issue any point with respect to health, sanitation, or discipline.

4. The opinion made it clear that the situation arose in a general or comprehensive public high school. It did not involve a private school, secular or religious in nature. It did not involve a grammar school or other institution below secondary school level.

5. What the case clearly pointed out was that the principal had issued an *ad hominem* order based solely on what the lawyers would call his *ipse dixit*. In short, he acted autocratically without any regulation to support him, and without offering in court any rational basis for his conduct.

6. This Court not only left unsettled what disposition would be correct if there were a showing that health or cleanliness was involved, but indicated that there might be a showing of reasonable disciplinary demands which would be determinative. Of course, rational discipline has a value, and there are circumstances in which the young must be taught the worth of conformity as well as the worth of individuality. But an attempt to impose conformity for the sake of conformity, or merely to accord with a principal's prejudices is not entitled to prevail over the personal liberty of a student to choose his hair style.

7. Aesthetic considerations having a rational objective foundation may also properly be taken into account by a representative of a state in determining policy. In Village of Euclid, Ohio v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 the Supreme Court sustained the right of a state or a subdivision thereof to regulate on aesthetic grounds a man's development of his own property. Mr. Justice Sutherland observed the impropriety of "a pig in the parlor." (p. 388, 47 S.Ct. p. 118). That test might have application to some students in some classrooms. But plaintiff Robert Richards appeared more like Little Lord Fauntleroy, the hero of Frances Hodgson Burnett's celebrated book, than a character out of *Johnny Crow's Garden*.

### SECOND SUPPLEMENTARY OPINION

My attention has been called to Crews v. Cloncs, (S.D.Ind.) 303 F.Supp. 1370, as reported in 38 U.S. Law Week 2187. There a student sought to have a principal enjoined from suspending him for having violated a regulation against wearing long hair. Chiefly on the ground that "The school authorities unequivocally state that long hair disrupts classroom atmosphere, impedes classroom decorum, disturbs other students, creates class disruption, and involves health and safety standards in physical education classes", the court denied relief. It seems that the court concluded that plaintiff was barred principally because his long hair caused others to be disorderly. This Court takes the position that that is not a valid ground for denying plaintiff's liberty to wear his hair as he pleases. A man may not be restrained "from doing a lawful act merely because he knows that his doing it may cause another to do an unlawful act." Beatty v. Gillbanks, 9 Q.B.D. 308, 314 (1882) (where it was held that the Salvation Army could not be forbidden to parade merely because hostile groups choose to start a disturbance.) As Professor Zecheriah Chafee, Jr. observed in Free Speech In The United States (1941) pp. 151–152, 160–161, it is absurd to punish a person "because his neighbors have no self-control and cannot refrain from violence." And as an illustration of such absurdity Professor Chafee referred to the imprisonment of

Joseph Palmer because he persisted in wearing such a long beard that people kept mobbing him.

## THIRD SUPPLEMENTARY OPINION

After the opinion rendered in the instant case, this Court perceived a problem involving the construction of the Civil Rights Act of 1871, 42 U.S.C. Sec. 1983, which requires a supplementary opinion.

In the instant case plaintiff complains that, by his purposeful, arbitrary action, defendant principal, acting under color of state law, excluded plaintiff student from the senior class in a comprehensive high school solely on the ground that he would not cut his long (but tidy and clean) hair to meet the principal's predilections.

Leonard v. School Committee of Attleboro, 349 Mass. 704, 212 N.E.2d 468, 14 A.L.R.3d 1192, as well as rulings by lower courts of the Commonwealth, show that plaintiff could not secure relief in the state courts within the time that would be reasonably effective.

Plaintiff, therefore, invoked this federal court's jurisdiction under 28 U.S.C. Sec. 1343(3) for a remedy of the right he claimed under the Civil Rights Act of 1871, c. 22 sec. 1, 17 Stat. 13, 42 U.S.C. Sec. 1983.

The right claimed by plaintiff might be described as one of the aspects of personal liberty, that is, liberty of appearance, including the right to wear one's hair as he pleases or, alternatively, as one of the aspects of freedom of expression, that is the right symbolically to indicate his association with some of the younger generation in expressing their independent aesthetic and social outlook and their determination to reject many of the customs and values of some of the older generation. Supporting the first alternative are a number of United States District Court cases, e. g. Griffin v. Tatum, 300 F.Supp. 60 (M.D.Ala.); Zachry v. Brown, 299 F.Supp. 1360 (N.D.Ala.); Breen v. Kahl, 296 F.Supp. 702 (W.D.Wis.). Tending to support the second alternative is Tinker v. Des Moines School Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731.

In any event, the rights claimed are verbally within the plain words of 42 U.S.C. Sec. 1983 which reads as follows:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

But it might be contended that plaintiff is not entitled to a federal remedy because the 1871 Civil Rights Act is not to be read literally. See Note, Limiting the Section 1983 Action in the Wake of Monroe v. Pape, 82 Harv.L. Rev. 1486; Note, Exhaustion of State Remedies under the Civil Rights Act, 68 Col.L.Rev. 124. But see comment on Rose Chalet Functions Corporation v. Evans, 264 F.Supp. 790 (D.Mass.) in Note, 55 Georgetown Law Journal 1168.

Plain words often are a trap for those unskilled in jurisprudence. This is a lesson emphatically taught by myriad cases interpreting the generalities of the Constitution, or indeed of any statute, especially a revolutionary enactment, concerned with fundamental social, economic, or political matters. The history of civil rights litigation, like anti-trust litigation, is replete with instances where courts, by so-called interpretation, have subtracted from or added to the literal text. Sometimes a glossator has relied on supposed purposes of the legislators, or on their debates at the time of enactment, or on their recitals of evils sought to be remedied, or on their putative responses to circumstances strictly contemporary with the enactments. Not infrequently, the judicial subtractions and additions have found their alleged justification in the resolutions in Heydon's Case, 3 Co. 7a,

76 Eng.Rep. 637. See Felix Frankfurter, The Reading of Statutes, 47 Col.L.Rev. 527, republished in Of Law and Men, p. 44.

By such judicial techniques courts have held that the 1871 Civil Rights Act does not create a federal substantive right redressable in a federal court each time a plaintiff has had one of his civil rights under the Constitution invaded by a state official acting under the color of state law. It will suffice to cite Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288; Rose Chalet Functions Corporation v. Evans, 264 F.Supp. 790. See also the annotations to 42 U.S.C. Sec. 1983, said to be "one of the most heavily litigated sections in the United States Code." 82 Harv.L. Rev. 1486, 1487, note 12.

This is not the time, nor is this court the tribunal, to draw the full picture of the limitations imposed upon the plain language of the 1871 Civil Rights Act by policy considerations, such as the historical origin of the Act, or the nature of the federal structure of the United States Constitution, or the advantages of comity and orderly relations between state and federal courts, or the risk of overburdening the federal judicial system, or the possibilities that state courts and state legislatures may find better solutions if inferior federal tribunals abstain from, defer, or deny jurisdiction, or the danger that the literal interpretation will promote trivial claims preventing the prompt disposition of more serious controversies.

Now it is sufficient to note:

First, the issues here presented with respect to arbitrary official orders as to hair style are serious in the eyes of a very large proportion of our society (though perhaps the degree of concern varies according to age levels) and that that serious concern involves fundamental liberties. Such serious concern is not purely emotional. It has a rational core. And it is, quite literally, a fighting issue for some. To belittle the issue might reveal judicial prejudice, not perceptiveness.

Second, the issues at bar arise in a context where defendant is charged with having *purposefully* invaded plaintiff's claimed right. See Rose Chalet Functions Corporation v. Evans, 264 F. Supp. 790. Moreover, that purposefulness is shown by an order for which there has been laid no rational foundation. The order represents personal predilection. Such personal predilection rests upon an *animus* directed against plaintiff's liberty of appearance. An *animus*, not rationally supported, constitutes, in the legal sense, not in the popular sense, "malice." The foregoing is not intended to imply any moral or like defect in the defendant principal. In his contact with the court he has been courteous and cooperative. He was carrying out a policy which he favored and which many school authorities both in his locale and elsewhere favored. There is no indication that he had ill-will toward plaintiff personally or that in the popular sense he had malice. The only kind of malice which is attributed to him is the technical legal type described by Oliver Wendell Holmes, Jr. in "Privilege, Malice, and Intent", 8 Harv.L.Rev. 1.

Third, against this purposeful, arbitrary, "malicious" order it is clear that the courts of the Commonwealth would not as of this date give a remedy sufficiently prompt and comprehensive to enable plaintiff to complete seasonably his senior year in high school and would impose upon him a burden not constitutionally justified.

Fourth, while plaintiff's claim is individual and he has not brought a class suit, the exhibits tendered show that he is indeed one of a group of people similarly situated and similarly deprived of their liberties by similar orders of the same defendant. For the federal court not to respond would have wide implications.

In combination, the factors recited show that plaintiff claims relief against the "malicious" or purposeful invasion by a state official of one of plaintiff's fundamental liberties, and that he has now no practically effective

remedy in the state courts. This is sufficient not merely to meet the words of the 1871 Civil Rights Act but such glosses as have been applied by judicial authority. See, for example, Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492; McNeese v. Board of Education, 373 U.S. 668, 669, 83 S.Ct. 1433, 10 L.Ed.2d 622; Damico v. California, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647; Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288; Rose Chalet Functions Corporation v. Evans, 264 F.Supp. 790.