**AMERICAN CIVIL LIBERTIES UNION,** a New York nonprofit membership corporation; American Humanist Association, a corporation organized under the laws of the State of California; American Jewish Congress, a New York membership corporation; Greater Pittsburgh Council of Unitarian-Universalist Churches, an unincorporated association; Reverend Edward A. Cahill, Reverend Peter Ainslie, Reverend Richard P. Ridenour, Edwin J. Mangold, individually and as parent and natural guardian of James A. Mangold and Leonard Mangold, Reverend Alexander Seabrook, and Reverend Walter E. Wiest, Plaintiffs,

v.

The **ALBERT GALLATIN AREA SCHOOL DISTRICT,** Fayette County, Pennsylvania, c/o Carmine Molinaro, Esq., Solicitor, 311 Second National Bank Building, Connellsville, Pennsylvania 15425, c/o Ruby Provane, Secretary, Fairchance-Georges Junior-Senior High School, R. D. #2, Uniontown, Pennsylvania 15401, Defendants.

Civ. A. No. 69–558.

United States District Court
W. D. Pennsylvania.
Dec. 19, 1969.

Louis Kushner, Pittsburgh, Pa., for Mangold and his sons.

Carmine Molinaro, Connellsville, Pa., for The Albert Gallatin Area School District.

## OPINION

ROSENBERG, District Judge.

This matter is here on a complaint seeking injunctive relief to enjoin the Albert Gallatin Area School District from conducting or observing religious programs in its schools.

The defendant filed an answer to the complaint in which it denied that the opening exercises conducted throughout the schools in the defendant school district constituted the establishment of a religious ceremony or exercise within the prohibitions of the First and Fourteenth Amendments. In addition the Albert Gallatin Tax Protest Committee intervened as a party defendant under Rule 24 of the Federal Rules of Civil Procedure.

A hearing was thereafter held and both sides presented evidence. The parties agreed that the hearing be final and that a final determination be made in the case.

From all of the evidence produced by the parties I find the facts as follows: the defendant, Albert Gallatin Area School System is a joint school established by agreement between the former Fairchance-Georges School District, the former German Township School District and the former Albert Gallatin School District as authorized by the Pennsylvania Legislature in § 1701 of the Act of March 10, 1949, P.L. 39 (24 P.S. § 17–1701) for the purpose of establishing, operating, and administering certain public schools; the School District is a joint school district encompassing Georges, German, Springhill and Nicholson Townships, and the Boroughs of Point Marion, Masontown, Fairchance and Smithfield; the School District contains 6 Elementary schools, 4 Junior High schools, and 3 Senior High schools; the school district is a political subdivision of the Commonwealth of Pennsylvania; the school district is governed by elected school directors pursuant to the laws of the Commonwealth of Pennsylvania; at the meeting of the Board of Education of the Albert Gallatin School District on March 17, 1969, "A motion was made by Langley, seconded by Boni, that the Albert Gallatin Area School District install Bible reading and some non-denominational mass prayer in the school district"; no formal resolution as such, other than the motion, was adopted and no procedure as such was inaugurated by the school board; thereafter a program was adopted and conducted by teachers, parents and students whereby a student, acting without direction or command would read a passage of his own choosing from his own personal Bible, over the school's public address system; such reading was followed by a recitation of the Lord's Prayer and the Pledge of Allegiance recited in unison; in those schools which were not equipped with a public address system, such programs were conducted in the individual classrooms, at the election of the teacher in charge; no student was compelled to remain within the hearing of any such programs; the plaintiff is Edward J. Mangold whose two sons, James A. Mangold and Leonard Mangold, are students in the school system; the Mangolds are of the Roman Catholic persuasion; Mr. Mangold and his children object to the Lord's Prayer as recited and to the reading of any Biblical passages during school hours; some few others in the school district also object to these exercises, but the number of those objecting is a very small percentage of the entire constituency of the school district which consists of 5,000 to 6,000 students; the

vast majority or bulk of the students and their parents, who are of various religious persuasions, desire and encourage such programs as a matter of spiritual or moral stimulation; no definable tax monies are used in the performance of these programs, and the School District and its functions are maintained by the collection of school taxes from property owners in the School District.

The plaintiff here contends that the action of the School Board in authorizing and sanctioning these programs constitutes a religious establishment in violation of the provisions of the First Amendment which provides that:

> "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; * * *."

This Amendment has been made applicable to the states through the Fourteenth Amendment, Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). The plaintiff seeks to have the March 17, 1969 "motion" of the School Board declared unconstitutional, and in support of his position, the plaintiff cites the authority contained in School District of Abington Township, Pa. v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963).

Because the plaintiffs, American Civil Liberties Union, a New York nonprofit corporation, American Humanist Association, a corporation organized under the laws of the State of California, American Jewish Congress, a New York membership corporation, Greater Pittsburgh Council of Unitarian-Universalist Churches, an unincorporated association, Reverend Edward A. Cahill, Reverend Peter Anislie, Reverend Richard P. Ridenour, Reverend Alexander Seabrook, and Reverend Walter E. Wiest, presented no evidence whatsoever that they were aggrieved parties, their actions were dismissed with the privilege granted to the American Civil Liberties Union, representing it and plaintiff Mangold, to present a brief amicus curiae. That it failed to do.

I fail to see how a committee or organization from far removed areas such as New York or California, or even local Pittsburgh individuals or groups, whatever their make-up or constituency, can be aggrieved parties on completely local matters concerning a school district in a remote portion of Pennsylvania. Neither am I inclined to allow grievance party status to groups of individuals who professionally seek to inculcate themselves into litigation for the sake of litigation itself, or who seek to induce litigation by persons, remote from them, which litigation is totally unrelated to the personal rights of such individuals.

That is not to say that there may not be an appropriate time for individuals or groups of individuals to come forward to assist helpless, needy or persecuted individuals who may be in need of counsel for the defense or protection of individual rights. In fact, such actions are often laudable. However, to say that these organizations have standing as taxpayers on the same basis as those they accuse of misapplication of tax funds, because of some ephemeral contention, such as that Commonwealth funds are allocated to the defendant school district, is too remote. "* * * [W]hen standing is placed in issue in a case, the question is whether the person whose standing is challenged is a proper party to request an adjudication of a particular issue and not whether the issue itself is justiciable." Flast v. Cohen, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968). The situation here is in some respect analogous to the situation in Frothingham v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923) where an individual taxpayer brought suit to enjoin the distribution of funds under the provisions of an Act of Congress. The Court, at page 487, 43 S.Ct. at page 601 said that "* * * the relationship of a taxpayer of the United States to the federal government is very different. His interest in the moneys of the treasury—partly realized from taxation and partly from other

sources—is shared with millions of others, is comparatively minute and indeterminable, and the effect upon future taxation, of any payment out of the funds, so remote, fluctuating and uncertain, that no basis is afforded for an appeal to the preventive powers of a court of equity."

While the rights of Federal Taxpayers to sue as such is governed by the decisions in *Frothingham* and *Flast,* the right of resident municipal taxpayers to sue in that capacity has been affirmed by the Supreme Court. Crampton v. Zabriskie, 101 U.S. 601, 25 L.Ed. 1070 (1880); Massachusetts v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923); *Flast,* supra. From these decisions, the question of standing is to be determined by the proximity or remoteness of the individual or groups bringing suits and the funds involved, that is, "the taxpayer must establish a logical link between that status and the type of legislative enactment involved." Flast, 392 U.S. at 102, 88 S.Ct. at 1954. However, a parent who has a child or children within the municipal school district may be an aggrieved person and thereby acquires the right to raise a legal or constitutional barrier to the expenditure of funds, and allege that such acts infringe upon his constitutional rights. This is the basis upon which the plaintiff Mangold is here a proper party, and this is so in spite of the fact that some evidence indicated that the preparation and presentation of the action was other than his.

The plaintiff argues that this case is governed by the principles of *Abington,* supra, in which a challenge was leveled at a statute of the Commonwealth of Pennsylvania, 24 Pa.Stat. Sec. 15–1516, as amended, P.L.1928 (Supp.1960), Dec. 17, 1959, which provided that "at least ten verses from the Holy Bible shall be read without comment, at the opening of each public school on each school day. Any child shall be excused from such Bible reading, or attending such Bible reading, upon the written request of his parent or guardian."

In *Abington,* the situation arose as a result of the actions of the school authorities in enforcing a statute of the schools of the Commonwealth. In striking down the statute as being unconstitutional, the Supreme Court said "*    * it might well be said that one's education is not complete without a study of comparative religion or the history of religion and its relationship to the advancement of civilization. It certainly may be said that the Bible is worthy of study for its literary and historic qualities. Nothing we have said here indicates that such study of the Bible or of religion, when presented objectively as part of a secular program of education, may not be effected consistently with the First Amendment. But the exercises here do not fall into those categories. They are religious exercises, required by the States in violation of the command of the First Amendment that the Government maintain strict neutrality, neither aiding nor opposing religion." Abington, supra, 374 U.S. at 225, 83 S. Ct. at 1573.

The Supreme Court in its analysis did not indicate whether the voluntary actions of students in verbalizing their thoughts as they relate to spiritual or moral conduct would be of a constitutional dimension. But, the Court has indicated that where the government attempts to limit or curtail any fundamental right of the individual, that agency imposing the restriction has a substantial burden of justification. Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). It has been held that "*    * * a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)

What then would happen if the first thing in the morning a student were to stand up and read a passage from his Bible and recite the Lord's Prayer? Should the teacher, with her "persuasive" powers suppress such a student, or would such action by the teacher violate the individual's right of free speech?

In a recent holding, the Supreme Court has indicated that a public demonstration by students antipathetic to the Government's policy in Vietnam, as reflected by wearing black armbands, was a right which a school district could not suppress in view of the fact that the demonstration was not disruptive and did not impinge upon the rights of others. Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969)

So, too, a radical demonstration of personal dress or physical appearance may not be suppressed by school authorities. Breen v. Kahl, 419 F.2d 1034, C.A. 7, 1969; Griffin v. Tatum, 300 F.Supp. 60 (M.D.Ala.1969); Zachry v. Brown, 299 F.Supp. 1360 (N.D.Ala.1967); Richards v. Thurston, 304 F.Supp. 449 (N.D.Mass.1969). Also, the use of reading materials containing what would ordinarily be considered profane language by a teacher in his classroom may be a protected privilege in view of the circumstances in which the words are employed. Keefe v. Geanakos, 418 F.2d 359, C.A. 1, 1969.

In the instant case, because students and their parents wanted such programming, the Board merely decided to "install Bible reading and some non-denominational mass prayer in the school district." No compulsive words were employed. One finds it difficult to interpret the dictates of the First Amendment in such a light as would favor an individual against many, where injury or prejudice suffered by this extremely small minority is either non-existent or slight in comparison with the desire of the overwhelming majority who feel that in this day and age a few moments of moral or spiritual stimulation is beneficial and highly desirable. However, we are faced with the cogent argument that the constitutional rights of a single individual must never be sacrificed as against the will of the majority. But we must also be mindful of the fact that the constitutional rights of the majority of the people are as well entitled to protection. While different, the constitutional principle is not unlike the criminal proceedings where we attempt to insure that not a single innocent person be exposed to criminal punishment, even though as a result many criminals escape as threats to the public welfare.

It may be elucidating and inspirational to have Bible readings and prayer recitations in school, and it may well be what an overwhelming majority of the pupils and parents in the school district desire. It may even be that I agree that it would be most beneficial to the students to have these exercises, but I can do nothing more than observe the dictates of our law as interpreted by our Courts.

It may be a fact that the school district wished to install "Bible reading and some non-denominational mass prayer in the school district", and that its purpose was as the School Superintendent described it for the betterment of the "moral and spiritual values of the pupils." It may also be a fact that the amount of public funds for conducting such programs was infinitessimal. But, none of these present legally persuasive elements. What is important is that some legislative element procured, upon school premises, during school sessions, actions sounding in establishment of religion.

While a motion in a school legislative body does not attain the level of a state statute or of a municipal ordinance or, even of the resolution of a political subdivision, such as is the School District, and although a motion may even prescribe a temporary or special rule of conduct, the purpose of the present motion was as equally effective as if it had been of a higher order of legislation.

Mr. Justice Clark writing for the Court in *Abington* said: "The place of religion in our society is an exalted one, achieved through a long tradition of reliance on the home, the church and the inviolable citadel of the individual heart and mind. We have come to recognize through bitter experience that it is not within the power of government to invade that citadel, whether its purpose or effect be to aid or oppose, to advance or retard. In the relationship between man and religion, the State is firmly committed to a position of neutrality. Though the application of that rule requires interpretation of a delicate sort, the rule itself is clearly and concisely stated in the words of the First Amendment." 374 U.S. at 226, 83 S.Ct. at 1574.

The Seventh Circuit considered a similar situation in DeSpain v. DeKalb County Community School District 428, 384 F.2d 836, C.A. 7, 1967, cert. den. 390 U.S. 906, 88 S.Ct. 815, 19 L.Ed.2d 873 (1968), where it was asked to review a simple verse of thanksgiving without any mention of a Divine Being. The Court in *DeSpain* stated at page 839:

"It is not to be gainsaid that the verse may have commendable virtues in teaching kindergarten children 'good manners' and 'gratitude', * * *. The fact, however, that children through the use of required schoolroom prayer are likely to become more grateful for the things they receive or that they may become better citizens does not justify the use of compulsory prayer in our public school systems * * * if prayers which tend to teach and inculcate these virtues are not within the ambit of the bar imposed by the first amendment against such religious activity, any religious activity of whatever nature could be justified by public officials on the basis that the activity has beneficial secular purposes; * * *."

In the present action, the origin of the practice of reading the Bible and encouraging group recitation of the Lord's Prayer was the motion of the School Board of March 17, 1969. Thus, this factor coupled with the fact that the exercises were conducted on school property during school sessions, makes it the action of a political subdivision of the State government and as such within the ambit of the holding of the Supreme Court in *Abington*, supra. "Although courts are reluctant to interfere with conflicts which arise in the operation of school systems, courts will interfere when such conflicts 'directly and sharply implicate basic constitutional values.'" Breen v. Kahl, supra. The action of the School Board and the school authorities in this case is illegal and must be enjoined.

The First Amendment contains a double admonition. Congress, and by virtue of the Fourteenth Amendment, other legislative bodies, "shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."

While I am required to declare unconstitutional the legislative action of the School Board and the programs which were brought about by reason of such legislative action, I do not here indicate that the Amendment prohibits the free exercise of religion, since the opposite is true. The Amendment merely makes it unlawful to make a law respecting either the establishment of religion or the prohibiting of the free exercise thereof. Thus, I make no ruling of what effect, if any, the free actions of children, meeting on their own time and of their own volition, even though on school premises, would have. I merely indicate here that such exercises are not proper when conducted by direction of the public school authorities.

This opinion incorporates Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52.

A final injunction will be granted restraining the School District and all its agents from proceeding with any programs on the school premises during school sessions, by virtue of the motion of the School Board of March 17, 1969.

### ORDER

And now, to-wit, this 18th day of December 1969, for the reasons set forth in the foregoing Opinion, the School Board

motion of the Albert Gallatin Area School District dated March 17, 1969, is hereby declared unconstitutional as being in violation of the First Amendment of the Constitution of the United States, and the defendant, the Albert Gallatin Area School District, and all its agents, are hereby enjoined and restrained from directing or causing to be read the Holy Bible, or reciting the Lord's Prayer as part of any ceremony, observance, exercise or school routine, pursuant to such School Board motion; provided, however, that nothing herein contained shall be construed as interfering or prohibiting any students in the free exercise of religion, or from interfering or prohibiting the use of any books or works as educational, source or reference material in the ordinary personal observance by any student of his or her individual choice as of any prescribed time which does not interfere with the ordinary purposes of the School District.