Jerald GERE, a minor, by his Father and next Friend, Paul Gere, Plaintiff,

v.

Emory R. STANLEY, as Superintendent of Blue Ridge School District, Clair W. Young, as Principal of Blue Ridge High School, and Douglas Melhuish, as President of the Blue Ridge Board of Education, Defendants.

Civ. No. 70–477.

United States District Court,
M. D. Pennsylvania.

Nov. 6, 1970.

Hobbs, Morgan & DeWitt, Tunkhannock, Pa., for plaintiff.

Nogi, O'Malley & Harris, Scranton, Pa., for defendants.

## MEMORANDUM

NEALON, District Judge.

Jerald Gere, sixteen, an eleventh-grade student at Blue Ridge High School, has instituted this action against the Principal, Superintendent and School Board President of the Blue Ridge School District following his suspension from school in September, 1970, for violation of the hair portion of the school Dress Code. Jurisdiction is based upon the Civil Rights Acts, 42 U.S.C. § 1983, and 28 U.S.C. § 1343. Evidence was taken at a hearing on October 14, 1970, which, upon agreement of the parties, was the first and final hearing in this matter. The case is now before the Court for final disposition.

Blue Ridge High School is located in New Milford, Pennsylvania, and has an enrollment of 860 students. While there was no written Dress Code prior to the 1968-1969 school year, at the request of faculty members who complained that style changes were causing disruptions and distractions in the classrooms, the School Principal, Clair W. Young, orally informed the student body of specific re-

quirements relative to student appearance. In September, 1969, Jerald Gere, a transfer student from New York, enrolled in the tenth-grade class. At the start of the 1969-1970 school year, the students were orally advised at a general assembly, and the parents through a newsletter from the Principal, that certain rules had been adopted pertaining to student dress, including the following:

"Hair length will be determined to a large extent by how well it is kept and groomed. When the hair becomes so long that it can't meet these conditions then a haircut is in order. No beards or mustaches are allowed. Sideburns may be worn even with the ears."

In November, 1969, a committee of girls from the Student Council requested the Principal to revise the Dress Code in order to allow the wearing of culottes and, after submitting the matter to the faculty, approval was granted. In February, 1970, the Student Council asked for a modification of the rule concerning blue jeans and subsequently the modification was adopted pursuant to a faculty recommendation. In the meantime, numerous complaints were made to the Principal about the hair style and appearance of Jerald Gere, who, at this point, had allowed his hair to grow to shoulder length and was attempting to grow a goatee. For example, (a) a student complained that because of Jerald's poor eyesight, he leaned forward while eating to the degree that his hair would hang in his plate and he would then throw his hair back out of the plate, causing annoyance to others in the cafeteria; (b) another student refused to sit next to Jerald in class charging that his hair was dirty and "she couldn't tell what was going to crawl out of it", and (c) others accused him of causing annoyance by combing out the long strands of his goatee while in class. Jerald admitted that many students expressed displeasure with the length of his hair and charged that it was dirty and unwashed. According to Mr. Young, after receiving a similar complaint, he directed Jerald to wash his hair and Jerald complied. However, he refused to cut his hair, notwithstanding directives from the Principal, and was suspended by the Principal on March 19, 1970, and, after a hearing before the School Board, he was formally suspended on March 24, 1970. After a lawsuit was commenced in this Court to Civil No. 70-157, Jerald was reinstated pending this Court's decision. Resentment against Jerald's defiance of the Dress Code mounted and a students' petition warning him to cut his hair or it would be forcibly cut for him was stopped on order of School authorities after approximately sixty names had been affixed to it. A delegation from the American Legion called on the Principal protesting Jerald's refusal to abide by the Code and parents of students warned that " * * * we'll send our sons to cut his hair." Fortunately, the school year ended in June without further incident. During the summer, a new written Dress Code was drafted by the Administrative Staff and approved by the Faculty on August 31, 1970. The Code was then submitted to the Student Council, consisting of thirty representatives, and was approved with but one dissent after a change concerning the wearing of sandals without stockings in warm weather was agreed upon. The Code was accepted by vote of the School Board on September 8, 1970, to go into effect at the start of school on September 14, 1970. With reference to hair adornment, the Code provided:

"Hair length will be determined to a large extent by how well it is kept and groomed. Hair will not be allowed to be worn if the length touches or goes past the shirt collar of a regular man's dress shirt, nor will it be allowed when it grows over the ear or ears, nor if it is longer on the forehead than the line established by the eyebrows. When the hair becomes so long that it does not meet all of these conditions, a haircut will be in order. Beards and mustaches of any type are not allowed. Sideburns may be worn

but no longer than the bottom of the ear lobe."

Jerald reappeared for the 1970–1971 school year with tresses touching his shoulders, which style, he concedes, violates the new Dress Code. Once again he was asked to comply and again he refused. Suspension followed and this lawsuit was commenced.[1] Before plunging into the applicable law, it should be mentioned that, except as outlined above, Jerald caused no trouble at the School and was not disciplined for any infraction or misconduct unrelated to the Dress Code.

The States and school administrators have comprehensive authority, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools. This authority over the students, while comprehensive, is not absolute and a student's constitutional rights must be recognized and " * * * applied in light of the special characteristics of the school environment." Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 507, 89 S.Ct. 733, 21 L.Ed.2d 731, 736 (1969). In Pennsylvania, the Legislature has vested authority over student conduct and behavior, including the power to suspend temporarily because of disobedience or misconduct in the principal, vice principal and teachers, while the power of permanent expulsion is delegated to the Board of School Directors, 24 Purdon Statutes §§ 13–1317, 1318. Thus, the action of Public School Authorities constitutes State action. Of course, the State has an independent interest in the well-being of its youth, Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968), and its power to control the conduct of children reaches beyond the scope of its authority over adults. Prince v. Massachusetts, 321 U.S. 158, 170, 64 S. Ct. 438, 88 L.Ed. 645 (1944). "A democratic society rests, for its continuance, upon the healthy, well-rounded

growth of young people into full maturity as citizens, with all that implies." Prince v. United States, supra, at 168, 64 S.Ct. at 443. Nevertheless, high school students are persons under the Constitution and are possessed of fundamental rights which the State must respect. Tinker v. Des Moines School District, supra. However, Courts should not intervene in the resolution of conflicts which arise in the daily operation of our school systems and which do not directly and sharply implicate basic constitutional values. Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968). The threshold question, therefore, is just how basic and fundamental is the right to wear one's hair as one pleases? Considering the question in its broadest sense, there is no doubt that any State action limiting the length of hair or forbidding mustaches or beards on all male citizens would be constitutionally infirm. To me, an individual's taste as to hair length is not within the contemplation of First or Ninth Amendment freedoms, but is a personal liberty protected from State encroachment by the Due Process Clause of the Fourteenth Amendment. Richards v. Thurston, 424 F.2d 1281 (1st Cir.1970). Mindful then of the State's comprehensive authority to prescribe conduct in the schools and its greater power of control over children as distinguished from adults, on the one hand, and a student's constitutionally protected personal liberty, on the other, how are they to be resolved when they collide?

Initially it must be pointed out that it is the Court's responsibility to determine the constitutionality of this School Regulation and not the wisdom of it. I mention this because I feel the issue of hair length is receiving much more attention and creating more problems than it deserves. One need merely look around him to realize that the younger generation likes a longer hair style and, in time, today's extremes may become

---

1. Plaintiff raised the question of procedural due process, but expressly withdrew it at the time of oral argument so that this issue is not before us.

the order of the day. But there are far more serious problems in education, as well as out, that warrant our energies and efforts than a debate over the aesthetics and interpretations of hair style. To many of us hair style ceased to be a problem years ago, and while its discussion revives wistful memories, its significance becomes less important. However, as Judge Wyzanski noted in Richards v. Thurston, 304 F.Supp. 449 (D.C.Mass. 1969), affirmed 424 F.2d 1281 (1st Cir. 1970), Samson's locks symbolically signified his virility, many of the Founding Fathers of this Country wore coiffeured wigs, President Lincoln and most of his male contemporaries wore beards and long hair as did many of history's most eminent Judges. The present confrontation may well be a classic example of Shakespeare's "Much Ado About Nothing." But, in any event, it has become a major problem between school authorities and students, as evidenced by a deluge of Court cases in the past three years and is entitled to a constitutional construction.

The anti-dress regulation supporters argue (1) that the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools; (2) that new ideas and innovative thought should be encouraged in the classroom; (3) that eccentric hair style is no longer a reliable signal of perverse or improper behavior; (4) that there is no inherent reason why decency, decorum or good conduct requires a boy to wear his hair short; (5) that a policy to impose conformity for the sake of conformity should not prevail over the personal liberty of a student to choose his hair style; (6) that mere unattractiveness in the eyes of others, short of uncleanliness, should not justify such a proscription; (7) that forbidding a student to wear long hair because it annoys others allows their prejudices and biases to govern his rights; (8) that compliance with a hair length rule imposes an unreasonable condition to plaintiff's continuing as a student in a public educational system; (9) that unlike restrictions on dress which require compliance only during school hours, a requirement that hair be cut to a certain length remains with the student off the school premises as well as on; (10) that the curtailing of a student's fundamental rights imposes a substantial burden of justification on School authorities, and (11) School officials must show that a student's appearance materially and substantially interferes with the requirements of appropriate discipline in the operation of the school before it can be regulated.

The pro-regulation advocates contend (1) that the high school[2] educational mission brings together hundreds of immature, volatile, and aggressive children in closely confined quarters and must necessarily subject them to a wide variety of disciplinary measures in order to provide a suitable atmosphere for concentration, instruction, and study; (2) that in formulating regulations, including those pertaining to the discipline of school children, school officials should have a wide latitude of discretion; (3) that for many youngsters learning is a discipline rather than a pleasure and it must be carried out in dignified and orderly surroundings if it is to be practiced successfully; (4) that obedience to duly constituted authority is a valuable tool and respect for those in authority must be instilled in young people; (5) that regulations concerning dress are a part of the disciplinary process which is necessary to maintain a balance as between the rights of individual students and the rights of the whole in the functioning of schools; (6) that eccentric hair style and attire tends to distract and disturb the student body, thereby inter-

2. I would distinguish State authority over primary and secondary school students from that which should apply at the University level because of, inter alia, the age difference, the level of maturity, and the contrast between the setting and the operation of a high school and University. See C. A. Wright, The Constitution on the Campus, 22 Vanderbilt L.Rev. 1027, 1052 (1969).

fering with a teacher's ability to interfering; (7) that the regulation of dress and appearance involves faddish symbols and styles and not intellectual discourse which is of much greater importance and should be accorded a greater degree of protection against the restrictions of school authorities; (8) that interference by the Courts in the day-by-day operation of the school would dilute the authority of the educational systems and, in turn, undermine the effectiveness of the schoolmaster and the teacher, and (9) that the Courts should uphold school regulations where there is any rational basis for the questioned rule.

The leading case on Student-Administrative problems is Tinker v. Des Moines Independent Community School District, supra, in which the Court invalidated the action of the School District in suspending a high school student for wearing a black arm band symbolizing his opposition to the war in Vietnam. The Court reasoned that the arm band was worn for the purpose of expressing views and was closely akin to "pure speech", which cannot be restricted unless it materially and substantially interferes with the requirements of appropriate discipline in the operation of the school. However, Tinker is distinguishable from the present case inasmuch as plaintiff testified that he wore his hair long as a matter of personal taste and, consequently, did not intend it as a means of expression which may require the showing of a more compelling interest in order to justify such a limitation by school officials. See United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). Freedom of speech occupies a "preferred position"[3] in our society; it is "delicate and vulnerable, as well as supremely precious * * * (to be regulated) * * * only with narrow specificity."[4] The strict burden placed on the State where First Amendment rights are circumscribed is not applicable to the facts of this case. What concerns us here is the power of school

administrators to promulgate dress regulations which restrict the hair length of male students. The Court in Tinker was careful to point out that " * * * the testimony of school authorities at trial indicates that it was not fear of disruption that motivated the regulation prohibiting the armbands; the regulation was directed against 'the principle of the demonstration' itself." Moreover, Tinker specifically excluded its applicability to the "regulation of the length of skirts or the type of clothing, to hair style, or deportment."

It should be obvious that School Administrators do not have carte blanche authority to impose their tastes and attitudes upon the student population. They do not have absolute authority over their students, but may impose reasonable rules designed to assist in the fulfillment of the educational mission. School officials have the burden of showing that such rules are necessary to alleviate intereference with the educational process. Griffin v. Tatum, 425 F.2d 201 (5th Cir. 1970). "But in measuring the appropriateness and reasonableness of school regulations against the constitutional protections of the First and Fourteenth Amendments the courts must give full credence to the role and purposes of the schools and of the tools with which it is expected that they deal with their problems, and careful recognition of the differences between what are reasonable restraints in the classroom and what are reasonable restraints on the street corner." Judge Godbold, specially concurring in Ferrell v. Dallas Independent School District, 392 F.2d 697, 704 (5th Cir. 1968). The liberty guaranteed by the Fourteenth Amendment implies the absence of arbitrary restraint, not immunity from reasonable regulations. West Coast Hotel Co. v. Parrish, 300 U.S. 379, 393, 57 S.Ct. 578, 81 L.Ed. 703 (1937). Those of us who have little familiarity with the current problems in the teaching process should not hastily reject the judgment of

3. Kovacs v. Cooper, 336 U.S. 77, 88, 69 S.Ct. 448, 93 L.Ed. 513 (1949).

4. NAACP v. Button, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963).

those knowledgeable in the field who are intimately aware of the situations that give rise to distractions and diversions and, consequently, interfere with a teacher's ability to carry out his assignment. We must not overlook the fact that the regulation in question did not reflect the opinion of an individual administrator, such as existed in Richards v. Thurston, 304 F.Supp. 449 (D.C.Mass. 1969), and Zachry v. Brown, 299 F. Supp. 1360 (N.D.Ala. 1967), but represented a consensus of the thinking of Administrators, Faculty, Student Council, and the School Board, which certainly merits consideration on the question of reasonableness. The evidence in this case discloses that Jerald Gere's long hair and goatee appeared unsanitary at times and did cause some commotion among the students, distracting some, annoying others, and inciting some students to subscribe to a petition threatening resort to self-help if hair trimming was not done voluntarily. While this consequence is unfortunate, this was the situation with which the Principal was confronted and which he had to resolve. It was this experience, together with the request of Faculty members for a regulation setting the standards for students' appearances, that prompted him to draft the written Dress Code now under attack. As I mentioned previously, the Court's duty is to determine the constitutionality of hair regulation and not the wisdom of it.

Therefore, I find (a) that plaintiff's hair style does not constitute free speech within the protection of the First Amendment or a fundamental right under the Ninth Amendment, but is a personal liberty protected by the Fourteenth Amendment; (b) that a student's liberty in a high school environment may be regulated if such regulation is reasonable and necessary to alleviate interference with the educational process; (c) that the hair length limitation in the Blue Ridge Dress Code was proposed in a bona fide attempt to preserve order, to maintain a balance between individual students' rights and the rights of the whole, and to assist the Faculty in the fulfillment of the teaching function; (d) that the regulation was not an attempt by the Principal to impose his personal taste on the student population, but represented a consensus of Administrative, Faculty, Student and School Board opinions, and (e) that under the circumstances of this case, the hair style regulation was reasonable and necessary to alleviate interference with the educational process at Blue Ridge High School.

Plaintiff's complaint will be dismissed.

The foregoing will serve as Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52.