Steven **DUNHAM**, by next friend Philip Dunham, Prentiss Smith, by next friend Prentiss L. Smith and Paul B. Weber, by next friend E. Bruce Weber

v.

Bruce C. **PULSIFER**, Superintendent, et al.

Civ. A. No. 5862.

United States District Court,
D. Vermont.

May 5, 1970.

Raymond P. Perra, Fitts & Olson, M. Jerome Diamond, Kristensen, Cummings & Price, E. Bruce Weber, Weber & Fisher, Brattleboro, Vt., and James A. Rifkin, Wilmington, Vt., for plaintiffs.

F. Elliott Barber, Jr., Barber & Barber, and Robert Grussing, III, Brattleboro, Vt., for defendants.

## OPINION AND ORDER

LEDDY, Chief Judge.

This action is brought by Steven Dunham, Prentiss Smith and Paul B. Weber, students at Brattleboro Union High School, to enjoin the authorities of that School from enforcing the athletic grooming code enacted December 16, 1969. Pursuant to Fed.R.Civ.P. 65(a) (2) trial of the action on the merits was advanced and consolidated with the hearing on the application for a preliminary injunction.

## STATEMENT OF FACTS

From evidence presented at a hearing held on April 20, 1970, I find the following facts:

On December 15, 1969, the school authorities adopted a statement of "eligibility for participation in extra class scholastic activities." The statement sets forth a general expression of policy but does not attempt to establish any rules or regulations for the student body or for any extra class activity. However, it does contain the following:

C. Administrative Guidelines

1. The eligibility regulations stated on pages 91 and 92 of the Teachers' Manual shall be strictly enforced.

2. Health training standards for athletic participation such as those requiring proper sleep and borbidding (sic) the use of substances harmful to the human body and mind, such as alcohol, tobacco, and illicit drugs, may be prepared and enforced by the Department of Health, Physical & Safety Education.

3. The school administration in consultation with the appropriate department head and with the coaches or other sponsors, may set specific standards of dress and grooming for pupils during participation in and travel to and from interscholastic activities as may be necessary to properly carry out such activities.

In November of 1969, the high school adopted a student dress code, also set forth in general terms. No complaint is made with respect to the provisions of either the dress code or the extra class scholastic activity statement.

On December 16, 1969, pursuant to number 3 above, the School Board enacted the following athletic code:

In order to enhance *esprit de corps*, prevent adverse public reaction, prevent dissension on teams, and for the general welfare of teams and participants the following regulations governing dress and grooming for pupils participating in and traveling to and from interscholastic athletic activities are in effect:

1. Whenever eating and not traveling in team uniform, male athletes shall wear jacket and tie.

2. For males, hair must be cut tapered in the back and on sides of the head with no hair over the collar. Sideburns must be no lower than the earlobe and trimmed.

3. Males must be clean shaven and not wear beards and mustaches.

4. Females, when not traveling in team uniform shall wear skirts (no slacks or shorts).

5. Cleanliness and neatness shall be maintained at all times.

These regulations are not subject to review until one year from above date.

This code is now in effect and alleged violations of the code under paragraph 2 have resulted in the dismissal of the

plaintiffs from the tennis team. The plaintiff Dunham is a senior who stands eighth in his class of 360 students and has been accepted at several colleges. Plaintiff Smith is also a senior and tennis player. He has been a member of the Student Council and now is president of his class. Plaintiff Weber is a junior and stands tenth in his class. The three plaintiffs were ranked one, two and three on the tennis team and all were prevented from participating in the tennis match with Greenfield High School on April 16, 1970, for the sole reason that they failed to comply with paragraph 2 of the grooming code.

There is no grooming code for students in general or for students participating on the debating team, in the band, in the glee club or in any other extra curricular activity except athletics.

Of the top eight players on the team, six were dismissed because of violation of paragraph 2 of the code. The tennis coach feels that a high school graduate should be a well rounded person concerned not only with athletics and sports but one who takes an active part in school activities. All three plaintiffs have practiced diligently and worked hard at their tennis game. They also work hard and diligently at their studies. There was no dissension on the tennis team prior to their dismissal and no disciplinary problem except that created by paragraph 2 of the code. There was no evidence of any disciplinary problem or dissension on any other athletic team or of any public reaction to the appearance of any athlete at the school.

The length of a tennis player's hair does not affect his playing ability if his hair is kept out of his eyes and, if necessary, this could be readily done by the use of a headband. A wristband is generally worn by tennis players to keep perspiration off the hand and in fact is used by the tennis coach.

The school authorities attempted to justify the code for reasons of discipline and the promotion of closer team work. There is no evidence of lack of team work on the tennis team or on any other team. On the contrary, the tennis team as it was formerly constituted worked very successfully and well together and was a talented team. There are certain benefits which are derived from participating in competitive sports such as tennis.

Outside of uniformity in appearance, no evidence was introduced as to advantages to be derived from the athletic code except the question of discipline for the sake of discipline.

All three plaintiffs failed to comply with paragraph 2 of the code and are in violation at this time, but none of the plaintiffs presented an unkempt appearance.[1]

The plaintiffs, among other things, contend that the enforcement of paragraph 2 of the athletic code deprived them of their fourteenth amendment right to equal protection of the laws. The main question in this case is whether or not the School Board has sustained its burden of justifying the regulatory classification created by paragraph 2 of the athletic code under the equal protection clause.

## EQUAL PROTECTION

### A. ELEMENTS

■■ The equal protection clause is the Constitution's check on the generous latitude given legislative institutions to regulate by classification the citizens they represent. Generally, it is properly invoked only when certain elements are present. There must be a *classification* which is the creature of some *state ac-*

---

1. It is to be noted that under the existing athletic code, Billy Kidd, the world famous skier, would be unable to make the ski team. Joe Pepitone and Ken Harrelson, two colorful and popular major league ball players, would be unable to make the baseball team. Joe Namath would be barred from the football team and Ron Hill who won the Boston Marathon on April 19 of this year would not even be permitted to try out for the track team.

*tion,* and the classification must be *unjustified* under the applicable *standard of review.*

## B. CLASSIFICATION

An invalid classification is at the core of an equal protection violation. The *validity* of the classification depends on the standard of review applied to test the justifications which underly it. The proper *standard of review* depends in turn upon the nature of the interest threatened or disregarded by the classification. But before there can be any cogent discussion of constitutional validity under the possible standards of review, the classification itself must be examined.

Paragraph 2 of the dress and grooming code for athletes at Brattleboro Union High School prescribed among other things, the following:

> For males, hair must be cut tapered in the back and on sides of the head with no hair over the collar. Sideburns must be no lower than the earlobe and trimmed.

■ As a result of this provision, those students interested in athletic participation are grouped initially into two classes. Students whose hair length and grooming manner conform to the code are afforded the opportunity to compete for positions on the various athletic teams which represent Brattleboro Union High School. Students who violate the grooming code are denied access to these tax supported activities and may not participate or represent their fellow students in these programs. Through the dress code, the School Board of Brattleboro Union High School has singled out for different treatment this latter group of students from among the class of those students who are interested in athletic participation. The difference is simply that students with one hair style are not given the same opportunity to participate in athletics extended to students with a different hair style. Whether a high school student's access to publicly supported athletic activity is a "right" or a "privilege" is unimportant. If the school district through its elected officials extends this opportunity to one class of student athletes, it cannot deny it to another class without justification.[2] A privilege may not be dispensed arbitrarily. Shapiro v. Thompson, 394 U.S. 618, 627 n.6, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Griffin v. Illinois, 351 U.S. 12, 18, 76 S.Ct. 585, 100 L.Ed. 891 (1956); Sherbert v. Verner, 374 U.S. 398, 404, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); Goldstein, The Scope and Source of School Board Authority to Regulate Student Conduct and Status: A Nonconstitutional Analysis, 117 U.Pa.L.Rev. 373, 396–97 (1969); Comment, Equal Protection as a Measure of Competing Interests in Welfare Litigation, 21 Maine L.Rev. 175, 177 (1969). For a discussion of the right-privilege distinction in a due process context, see Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) and 1 K. Davis, Administrative Law §§ 7.11–7.13 (Supp. 1965).

High school athletes at Brattleboro Union High School are part of the overall educational program authorized and funded by the local School Board.[3] Discrimination in access to these programs is subject to examination under the light of the equal protection clause.

2. The justifications for the instant regulations are discussed in section (F) of this opinion, *infra.* The standard of review by which these justifications are weighed is set forth in section (D) (2) of the opinion, *infra.*

3. Varsity athletics are an integral part of the educational program at Brattleboro Union High School. Although it is not necessary in an equal protection context to equate a denial of access to these programs with a prohibition on regular attendance, a distinction between the two based on the quantity of deprivation each entails would seem to ignore the importance of a single piece in shaping the educational mosaic. I find such a distinction unconvincing. See Matter of Myers, N.Y.Ed.Dept.Dec. at 3 (July 25, 1969).

## C. STATE ACTION

■ The prohibition of the fourteenth amendment extends to all actions of the State which deny equal protection of the laws. This state action is readily found in the acts of duly elected or appointed officials at all levels of the governmental hierarchy within the state. The action of a local school board is state action within the context of the fourteenth amendment. Tinker v. Des Moines Independent Community School Dist., 393 U.S. 503, 507, 89 S.Ct. 733, 21 L.Ed. 2d 731 (1969); Westley v. Rossi, 305 F.Supp. 706, 709 (D.Minn.1969). See also 1 C. Antieau, Modern Constitutional Law §§ 8.1–8.2 (1969).

## D. STANDARD OF REVIEW

■ No state or local governmental institution could function without classifying citizens for various purposes and treating some differently from others. A myriad of legislative and administrative decisions at all levels of government are expressed as regulatory classifications. In general, the classification must be reasonable, not arbitrary, and it must rest upon some ground of difference having a fair and substantial relation to the object of the regulation. But a general statement of the standard is deceptive.

■ At least two possible standards have been adopted by the Supreme Court in determining the constitutional validity of a regulatory classification.[4]

### (1). *Restrained Review—Reasonable Classification*

■ The traditional equal protection test looks simply to the reasonableness of the regulatory scheme in light of its possible intended purposes. Under this test, a classification is valid if it is not arbitrary and has a reasonable connection with some permissible legislative or administrative purpose.[5] Slight justification in terms of reasonableness often suffices here because the only countervailing interest of the individual is his

---

4. Equal protection invokes a dual-level standard depending on whether or not fundamental liberties are threatened by the classification. Compare Goesaert v. Cleary, 335 U.S. 464, 467, 69 S.Ct. 198, 93 L.Ed. 163 (1948) with Shapiro v. Thompson, 394 U.S. 618, 634, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). See also Jefferson v. Hackney, 304 F.Supp. 1332, 1341 (N.D.Tex.1969) and Survey Note, Developments in the Law—Equal Protection, 82 Harv.L.Rev. 1065, 1076–1131 (1969). See section (D) (2) of this opinion, *infra.* The standard applied to discriminatory classifications based on race may be viewed as a third test demanding a very high quantum of justification. So high is the standard in fact that instances of racial discrimination are practically unjustifiable. Loving v. Virginia, 388 U.S. 1, 9, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). The Supreme Court has, for all practical purposes, held that race is constitutionally irrelevant and any governmental action which draws distinctions between burdens on individuals because of their race is invalid *per se.* Edwards v. California, 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed. 119 (1941). But cf. Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944).

5. Even if the regulatory classification is reasonably or even clearly related to its avowed purpose, the classification is invalid if the purpose itself is impermissible. Among those purposes which are impermissible in an equal protection context are regulatory objectives forbidden by other provisions of the constitution. For example, a statute or regulation intended to restrict the economic power of one racial group would be objectionable not because the classification was unrelated to purpose but because the discriminatory purpose itself is not permissible. Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). See Survey Note, Developments in the Law—Equal Protection, 82 Harv.L.Rev. 1065, 1081 (1969). To the extent that the purpose of the instant School Board regulation was *merely* to enforce a standard of taste upon the young athletes of Brattleboro Union High School, the purpose of the regulation is *impermissible* as a direct arbitrary restraint on rights protected by the first or ninth amendments and applied through the fourteenth. Other purposes do appear however which, although unrelated to the classification, are permissible or at least constitutional. (e. g. maintenance of discipline and team morale.)

stake in being treated the same as some particular group of his fellows. The regulatory classification must still be reasonable however and arbitrary classifications have been rejected simply because they were arbitrary. See Levy v. Louisiana, 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968). (Legitimacy or illegitimacy of birth bears no relation to the emotional suffering or lack of support which a child experiences at the death of his mother.) and F. S. Royster Guano Co. v. Virginia, 253 U.S. 412, 40 S.Ct. 560, 64 L.Ed. 989 (1920). (A statute which taxes local corporations on income derived from both in-state and out of state operations while entirely exempting locally chartered corporations who did all their business outside the state bears no relation to the protection of out of state business operations which might be taxed in the state where these operations were conducted.)

### (2) *Active Review—Fundamental Interests*

A regulatory classification which, in addition to the creation of differential treatment, serves to penalize the exercise of a fundamental right must be justified by a compelling governmental interest. The operational difference is that a court will invalidate a classification which infringes upon a separate fundamental right unless the classification is shown to be necessary in the service of some compelling state interest, rather than just rationally related to some permissible state interest. Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); noted in 83 Harv.L.Rev. 118, 119–120 (1969); Survey Note, Developments In The Law—Equal Protection, 82 Harv.L.Rev. 1065, 1127–31 (1969). See also Williams v. Page, 309 F.Supp. 814 (N.D.Ill. 1970) (where fundamental rights in an equal protection context are discussed in relation to high school activities. The district court found that requiring all

students to pay for the ceremonial trappings of graduation did not involve the infringement of fundamental rights.) The "compelling state interest" standard, or the standard of "active review" calls upon the state to show more than a link of reasonableness. The state must demonstrate the pressing importance of the classification in the context of some necessary governmental objective. The applicability of this standard to the instant situation depends on whether -or- not the classification created and perpetuated through the School Board's athletic dress code infringes upon the exercise of some fundamental right guaranteed the plaintiffs under our constitution.

### E. NATURE OF THE SEPARATE RIGHT

Putting the question in a rhetorical sense, what is the nature of the right threatened by the hair code? Before this unnamed right is labeled and in an effort to comb this problem into a neater part, it should be observed that the Constitution does not stop at the public school doors like a puppy waiting for his master, but instead it follows the student through the corridors, into the classroom, and onto the athletic field. Tinker v. Des Moines Independent Community School Dist., 393 U.S. 503, 512–513, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).

> In our system, state-operated schools may not be enclaves of totalitarianism. School officials do not possess absolute authority over their students. Students in school as well as out of school are "persons" under our Constitution. They are possessed of fundamental rights which the State must respect, just as they themselves must respect their obligations to the State.

393 U.S. at 511, 89 S.Ct. at 739. See also Sims v. Colfax Community School Dist., 307 F.Supp. 485, 487 (S.D.Iowa 1970) and Frain v. Baron, 307 F.Supp. 27 (E. D.N.Y. 1969).[6]

---

6. Witness the holding in Matter of Myers, *supra*, note 3. See also Wright, The Constitution on the Campus, 22 Vand.L.

Rev. 1027 (1969); Denno, Mary Beth Tinker Takes the Constitution to School, 38 Fordham L.Rev. 35, 56 (1969); Gold-

The nature of the right presented in the hair cases although called by many names, has invariably been deemed fundamental.[7] In Westley v. Rossi, 305 F. Supp. 706 (D.Minn.1969), it was referred to as the right " * * * of plaintiff Bruce Westley to wear a hair style of his choosing * * * [which is] guaranteed by the equal protection or the due process clauses of the Fourteenth Amendment." *Id.* at 713. Similarly, in Griffin v. Tatum, 300 F.Supp. 60 (M.D. Ala.1969) the court expressed the right in terms of fundamental substantive liberty which was protected through the due process clause of the fourteenth amendment. As the Court explained:

> * * * [T]here can be little doubt that the Constitution protects the freedoms to determine one's own hair style and otherwise to govern one's personal appearance.

*Id.* at 62.

Chief Judge Wyzanski in Richards v. Thurston, 304 F.Supp. 449 (D.Mass. 1969), aff'd, 424 F.2d 1281 (1st Cir. April 28, 1970), stated the nature of the right first in a general sense to be within the broad terms of the due process clause and then in his third supplementary opinion described it " * * * as one of the aspects of personal liberty, that is, liberty of appearance, including the right to wear one's hair as he pleases or, alternatively, as one of the aspects of freedom of expression * * *." *Id.* at 455.

Lastly, Judge Kerner writing for the majority in Breen v. Kahl, 419 F.2d 1034 (7th Cir. 1969) characterized the status of the right in terms that left little to the imagination.

> Whether this right is designated as within the "penumbras" of the first amendment freedom of speech * * * or as encompassed within the ninth amendment as an "additional fundamental right[s] * * * which exist along side those fundamental rights specifically mentioned in the first eight constitutional amendments" Griswold v. Connecticut, 381 U.S. at 488, 85 S.Ct. 1678 (J. Goldberg concurring), it clearly exists and is applicable to the states through the due process clause of the fourteenth amendment.

*Id.* at 1036.

■ The thrust of these decisions indicates that whether the right is characterized as one under the first, ninth or fourteenth amendments, or any combination of the above, or as a "penumbra" emanating therefrom, the right is substantial and fundamental. Perhaps the best expression describing this constitutionally protected activity is:

> * * * the right to some breathing space for the individual into which the government may not intrude without carrying a substantial burden of justification.

Griffin v. Tatum, 300 F.Supp. 60, 62 (M. D.Ala.1969).

Upon reflection, this has to be the conclusion reached. There are few individual characteristics more basic to one's personality and image than the manner in which one wears his hair. As

---

stein, The Scope and Source of School Board Authority to Regulate Student Conduct and Status: A Nonconstitutional Analysis, 117 U.Pa.L.Rev. 373, 396–97 (1969).

7. It has been observed that:
 * * * every interest found to be fundamental and therefore protected by the due process clause will also be fundamental under the equal protection clause, so that unequal treatment with respect to that interest would be upheld only on a very strong showing of justification. It does not appear, however, that every interest deemed fundamental under the equal protection clause will be protected by the due process clause. It may be, for example, that the due process clause does not require that a state provide a criminal defendant with an appeal as of right, whereas the equal protection clause does require that if the state provides an appeal to some it cannot deny it to others because of their inability to pay even where such a denial can be rationally defended. Survey Note, Developments in the Law— Equal Protection, 82 Harv.L.Rev. 1065 at 1130 (1969).

Chief Judge Wyzanski noted in *Richards*:

> Whether hairstyles be regarded as evidence of conformity or of individuality, they are one of the most visible examples of personality. This is what every woman has always known. And so have many men, without the aid of an anthropologist, behavioral scientist, psychiatrist, or practitioner of any of the fine arts or black arts.

304 F.Supp. at 451.

Furthermore, the cut of one's hair style is more fundamental to personal appearance than the type of clothing he wears. Garments can be changed at will whereas hair, once it is cut, has to remain constant for substantial periods of time. See *Goldstein, supra*, note 5 at 400. In addition to manifesting basic personality traits, hair style has been shadowed with political, philosophical and ideological overtones and as such has to be afforded a measure of the protection given these underlying beliefs. See Breen v. Kahl, 296 F.Supp. 702, 705 n. 3 (W.D. Wis.), aff'd, 419 F.2d 1034 (7th Cir. 1969); Braxton v. Board of Public Instruction of Duval County, Fla., 303 F. Supp. 958, 959 (M.D.Fla.1969); Calbillo v. San Jacinto Junior College, 305 F. Supp. 857, 861–862 (S.D.Tex.1969); See also C. Mackay, Extraordinary Popular Delusions and the Madness of Crowds. *Contra*, Brownlee v. Bradley County School Board, 311 F.Supp 1360 (E.D. Tenn. April 10, 1970) (upholding a student dress code as a proper exercise of aesthetic police power) and Neuhaus v. Torrey, 310 F.Supp. 192 (N.D.Calif. March 10, 1970).

## F. PURPOSE AND JUSTIFICATION

 Because the regulatory classification in this case designates a treatment differential and in the process infringes upon the fundamental rights of one of the created classes, the active standard of review should be used to test the justifications for the hair code.

 The regulations on hair length cannot stand unless the evidence shows that they are necessary in the service of some compelling governmental interest which it is the duty of the School Board to protect or enforce. It is not enough that the regulations be merely reasonable.

Several justifications for the athletic grooming code have been urged upon the court by the defendants. While the evidence pertaining to all these justifications will be analyzed in terms of the active standard of review, it might be well to mention at the outset that even under the traditional restrained standard the evidence fails to show a link of reasonableness between the code and the furtherance of some permissible objective of the athletic program. It should be noted that the authorization for the code itself restricts the adoption of regulations to those that " * * * may be necessary to properly carry out such activities."

### (1) *Performance*

There is no credible evidence in this case that hair length affects the performance of the tennis players at any competitive level. The tennis coach himself indicated that headbands could be and are worn to keep hair and perspiration out of the competitor's eyes. The evidence made it clear that a long haired player with a headband was not at a competitive disadvantage vis-a-vis a player with close cropped hair. In short, the record is barren of any evidence that long hair is a handicap to performance in the sport of tennis.

### (2) *Dissension*

There is no credible evidence that long hair on an athletic team of any kind creates dissension among the team members. In fact, the evidence is that the tennis team involved in this case was free from dissension before the plaintiffs were excluded from participation.

### 3. Discipline

Anyone who has ever played a competitive team sport knows the importance of team discipline. The coach must be able to control within reasonable limits those aspects of a player's behavior which relate to his performance as a contributing member of the team. Training and health rules must be obeyed by all. Conduct at practice sessions must be in precise conformity with schedules and objectives. During the actual competition, the coach's instructions must be accepted without question. The coach's right to regulate the lives of his team members does have limits, however. A coach may not demand obedience to a rule which does not in some way further other proper objectives of participation and performance. It is bootstrap reasoning indeed to say that disobedience of any rule weakens the coach's authority or shows a lack of desire on the part of the competitor thus justifying obedience to any rule however arbitrary.

If the rule is otherwise reasonable or, if in this case, it advances a compelling governmental interest vested in the school board, then it should be obeyed. But an otherwise arbitrary or unjustified regulatory classification cannot pull itself up by the bootstrap of its own existence. Breen v. Kahl, 419 F.2d 1034, 1038 (7th Cir. 1969).

### 4. Conformity and Uniformity

Perhaps the two most overworked words at the evidentiary hearing in the case were "conformity" and "uniformity". It was urged by the defendants that both were essential elements in the maintenance of any high school athletic program. Apparently, it is the theory of the defendants that any rule which forces conformity to some accepted social norm is justified in the context of a high school athletic team. The bootstrap quality of this justification is also apparent. Conformity to community standards is often enforced by government at all levels but it can never find justification in the creation of conformity per se. It would be a bit frightening if a naked emphasis on conformity were to prevail in our public schools. Today's high school student will find that the world beyond his graduation is filled with pressures directed toward conformity. He will certainly not be deprived of the experience. While conformity to reasonable rules of conduct is essential, conformity for its own sake is dangerous, and as the evidence indicated unrelated to performance in the sport of tennis. Standing alone, conformity per se is neither a reason or a justification for the hair code in this case. Richards v. Thurston, 304 F.Supp. 449, 454 (D.Mass. 1969), aff'd, No. 7455, 424 F.2d 1281 (1st Cir. April 28, 1970).

Uniformity in hair length regulations between the various sports at Brattleboro Union High School was advanced as an independent reason for its application to the tennis squad. Here again the only reason apparent from the evidence to justify uniformity is the value of uniformity for its own sake. None of the evidence indicated why every sport could not have its own rules on hair length which would be reasonably related to performance in that particular sport. If long hair does affect performance or safety in some high school sports, there is no evidence it has such an effect in tennis. Uniformity is not a reason in and of itself. Richards v. Thurston, 304 F.Supp. 449, 454 (D.Mass.1969), aff'd 424 F.2d 1281 (1st Cir. April 28, 1970).

### 5. Summary

The evidence shows no reasonable relation between the regulatory classification created by the dress code and the permissible objectives of a high school tennis program.

Measured against the active standard of review, which is applicable, the code falls far short of substantial justification. It is not essential to any compelling interest of which the school board is entrusted, and its enforcement cannot be upheld as a valid regulatory classification in light of its infringement

on the fundamental and substantial right of the plaintiffs. It is unconstitutional.

IT IS HEREBY ORDERED:

1. That the plaintiffs, Steven Dunham, Prentiss Smith and Paul B. Weber, and each of them, be reinstated as members of the tennis team of said Brattleboro Union High School with the same rights and privileges as each plaintiff had before his suspension.

2. That the defendants, their successors, agents, officers and servants be permanently enjoined and restrained from enforcing the athletic grooming code of Brattleboro Union High School against the plaintiffs.