Charles H. **BALDWIN**

v.

Robert G. **SMITH,** Warden, Vermont State Prison.

Civ. A. No. 5752.

United States District Court, D. Vermont.

June 19, 1970.

John A. Dooley, III, and Richard C. Blum, Vermont Legal Aid, Inc., Burlington, Vt., for plaintiff.

Jon C. Stahl, Asst. Atty. Gen., State of Vermont, Montpelier, Vt., for defendant.

## OPINION AND ORDER

LEDDY, Chief Judge.

Plaintiff is an inmate of the Vermont State Prison in Windsor, Vermont. On November 26, 1969, he filed a complaint in this court asking that part of the provisions contained in 28 V.S.A. § 252 (Supp.1969) be declared unconstitutional. Section 252 specifies among other rewards for good behavior, that a person confined in a state correctional facility shall be given a five day reduction in sentence for each month of approved work *without compensation*. The plaintiff alleges, that because only those who work without pay are given work-time reductions, the section creates a *de facto* classification of inmates into two categories. Those prisoners with independent outside income who are able to work without compensation and at the same time maintain reasonable economic freedom within the prison social structure make up one class. Those prisoners who do not have access to outside funds and must choose between reasonable economic freedom on the one hand and time off for work on the other make up the second class. It is the plaintiff's contention that the *de facto* discrimination created by section 252 is unjustified and unconstitutional because the carving out of this second class of inmates, for relatively disadvantageous treatment, is based solely on considerations of wealth.

On February 9, 1970, a hearing was held in this cause at which the following facts were found:

The plaintiff, Charles H. Baldwin, was convicted of a felony in the Essex County Court and was sentenced to hard labor in the State Prison, Windsor, Vermont, for a term of not less than four and one-half years or more than five years. Plaintiff was committed to the State Prison on January 6, 1967.

The Prison provides the bare elements for subsistence including food, clothing, shelter, medical care and limited recreational and library facilities. It also operates a canteen in which crackers, cof-

fee, cookies, cigarettes and candy are available. Paper, envelopes and postage for five letters per week are also provided by the regulations.

The plaintiff was employed in the Prison plate shop from January 12, 1967, to August 7, 1969; in the sawmill from August 7, 1969, to August 18, 1969; in the plate shop from August 18, 1969, to October 24, 1969; in the sawmill from October 24, 1969, to December 10, 1969, and back in the plate shop from December 10, 1969, to the date of the hearing.

The only property owned by the plaintiff at the time of commitment was $6.00 in money and a half acre of land in Warren, New Hampshire, which was subject to a support lien in the amount of $3,600.00 and against which taxes in the amount of $7.00 are assessed annually. Shortly after commitment, the plaintiff received a few dollars from his wife.

Solely because of his financial condition, the plaintiff chose to receive compensation for the above described work at the Prison. The original rate was 5¢ per hour for a 40 hour week and 8¢ per hour for overtime. The plaintiff's financial condition has improved to the extent that he now receives 10¢ per hour for a 40 hour week and 15¢ per hour for overtime. The Prison records indicate that plaintiff has performed his work in a satisfactory manner. He uses the money received for buying candy at the canteen, postage, books, magazines and a law correspondence course, as a result of which he graduated from the Blackstone Law School. The plaintiff always had a fascination for law and felt that a knowledge of the subject would help him upon his release from prison.

As of February 5, 1970, there were a maximum number of 50 compensable jobs available and on that date, 36 inmates were employed, of which 20 were receiving pay. The wage scale was promulgated by agreement between the office of the Warden, the Commissioner of Corrections and representatives of industries.

Because the plaintiff chose to accept compensation for his work, he did not receive the work-time sentence reduction provided for by Section 252, Title 28 of the Vermont Statutes Annotated. If he had refused compensation, he would be entitled to a deduction from his sentence of five days for each month that he was employed.

No evidence was introduced to show that the compensation or work-time alternative had any relationship to prison discipline or any other purpose connected with the proper administration of the prison.

The facts raise four legal issues for decision, three of which involve preliminary procedural questions.

(I) Can the plaintiff establish jurisdiction pursuant to 28 U.S.C.A. § 1343(3) (1962) without regard to the amount in controversy?

(II) Does the request for declaratory relief demand the empanelling of a three-judge court?

(III) Is this a proper case to apply one form or another of the abstention doctrine?

(IV) On the merits, does section 252, Title 28 of the Vermont Statutes violate the petitioner's fourteenth amendment right to equal protection of the law?

## I. JURISDICTION

The object of the constitutional deprivation in this case is the plaintiff's freedom for approximately seven months. In the strongest sense, the plaintiff's damage involves personal liberty which cannot be given a monetary value. Roberge v. Philbrook, 313 F.Supp. 608 (D. Vt. 1970). See Hague v. C.I.O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939); Gold v. Lomenzo, 425 F.2d 959 (2d Cir. 1970); Eisen v. Eastman, 421 F.2d 560, 563–565 (2d Cir. 1969). Jurisdiction is conferred by section 1343 (3) without regard to the amount in controversy.

## II. THREE-JUDGE COURT

Section 2281, Title 28 of the United States Code requires that injunctive restraint against the enforcement of a state statute, when based upon constitutional grounds, can only be ordered by a three-judge district court. However, when the constitutionality of a state statute is directly attacked but the prayer is for declaratory relief only a three-judge court is not required. Roberge v. Philbrook, 313 F.Supp. 608 (D.Vt. 1970). See Kennedy v. Mendoza-Martinez, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). See also American Law Institute, Study of Division of Jurisdiction Between State and Federal Courts, 245–246 (Ten. Draft No. 6, 1968).

## III. ABSTENTION

Three distinct types of the abstention doctrine are urged on the court by the defendant. First is the so-called "hands-off doctrine". The second variation is related to the policy underlining the Three Judge Court Act, 28 U.S.C.A. § 2281 (1965), *above;* and the third is the exhaustion of state administrative remedies.

### a. HANDS-OFF DOCTRINE

The civil remedy section of the Civil Rights Act of 1871, 42 U.S.C.A. § 1983 (1965) extends a right of action to every person who is deprived of a right, privilege or immunity secured by the Constitution and laws of the United States. While the statute does not limit the scope of the remedy to exclude those in penal institutions, the early cases effectively foreclosed the inmates' civil action for constitutional infringement by invoking the "hands-off doctrine". Justification for the doctrine usually took two forms: (1) a judicial reluctance to interfere in matters of prison administration and discipline and (2) a desire not to resolve important conflicts between state law and federal constitutional law until the state courts have had an opportunity to construe their own statutes.

The reasons underlying both these variations of the "hands-off doctrine" have been severely criticized, *see,* C. Wright, Federal Courts § 52 (2d ed. 1970); Note, Prisoner's Rights Under Section 1983, 57 Geo.L.J. 1270 (1969); and the application of the doctrine has been either expressly or impliedly rejected by the recent federal cases. Sensitivity to the problem of prison administration no longer prevents intervention when the constitutional rights of inmates are involved. Lee v. Washington, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968); Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964); Wright v. McMann, 387 F.2d 519, 522–523 (2d Cir. 1967) and Rodriguez v. McGinnis, 307 F.Supp. 627 (N.D.N.Y.1969).

### b. DEFERENCE TO § 2281 POLICY

The second variation of the abstention doctrine urged by the defendant is closely connected with the Three-Judge Court Act discussed above. Defendant contends that this Court ought to refrain from taking jurisdiction over a constitutional claim for declaratory relief when injunctive relief based on the same allegation would require the empanelling of a three-judge court. A similar rule was invoked in Arrow Lakes Dairy, Inc. v. Gill, 200 F.Supp. 729 (D.Conn.1961). In *Arrow Lakes,* Judge Blumenfeld was bothered by the similarity in practical effect between declaratory and injunctive relief. He concluded that to take jurisdiction as a single judge would be an abuse of discretion under the Declaratory Judgment Act. 28 U.S.C.A. § 2201 (1964). Two years after *Arrow Lakes,* however, the Supreme Court clearly distinguished declaratory relief from injunctive relief in the context of the Three-Judge Court Act. Kennedy v. Mendoza-Martinez, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). *Mendoza-Martinez* placed declaratory relief outside the operation of 28 U.S.C.A. § 2282 (1965) and by implication section 2281. See Roberge v. Philbrook, 313 F.Supp.

608 at 616–617 (D.Vt. 1970). Because of the pressure on district court calendars, the Supreme Court has recently cautioned against the use of a three-judge panel when it is not expressly required. Rosado v. Wyman, 397 U.S. 397, 403, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). See also C. Wright, Federal Courts § 52 at 206–208 (2d ed. 1970).

### c. EXHAUSTION OF STATE ADMINISTRATIVE REMEDIES

■ The exhaustion of state *administrative* remedies under section 1983 was raised as a third possible ground for abstention. There are no administrative remedies available to the plaintiff, however. Furthermore, there is strong evidence that the administrative exhaustion rule has been eliminated in the context of prisoner relief under the Civil Rights Act. Houghton v. Shafer, 392 U.S. 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1968). Abstention is not appropriate in this case.

## IV. EQUAL PROTECTION

### a. INTRODUCTION

■ I now turn to the merits of plaintiff's claim. His complaint alleges that the *de facto* classification created by 28 V.S.A. § 252 (Supp.1969) creates an unreasonable discrimination based solely on wealth. Before the operational effects of section 252 rise to the level of an equal protection violation, it must be shown that the section creates a discriminatory *classification* through *state action* and that the classification is *unjustified* in terms of governmental purpose, under the applicable *standard of review*.

### b. CLASSIFICATION AND STATE ACTION

28 V.S.A. § 252 (Supp.1969) provides in part that:

\*　\*　\*　\*　\*　\*

If he [a person confined in a state correctional facility] is employed for a period of more than one month *without compensation* and performs his work in a meritorious manner, he shall have a deduction of an additional five days from such sentence for each month so employed. \* \* \* (Brackets and emphasis added).

Simply stated, the plaintiff claims that the class of prisoners, of which he is a member, without access to outside income is forced to choose between a sentence reduction and the reasonable economic breathing space provided by pocket money. While at the same time prisoners who do have outside income sources are not in fact pressed into such a choice.

The compensation offered the prisoners in lieu of work-time is so minimal that it could not plausibly induce prisoners with other significant income sources to opt for it. The compensation alternative can therefore be attractive only to those without any other appreciable source of pocket money. The truly poor prisoner is forced to sacrifice either his work-time sentence reduction or his access to the minimal comforts and purchasable opportunities available in the context of prison life. The plaintiff asserts that he and other poor prisoners are at a comparative disadvantage vis-à-vis the prisoners with outside income, and that there is no justification for this discrimination in treatment.

■ Governmental classifications which create a disparity in treatment are at the foundation of all violations of the equal protection clause. Because of pre-existing pecuniary circumstances, section 252 creates a discriminatory treatment differential, and whether the object of the plaintiff's deprivation is a right or a privilege is unimportant. Shapiro v. Thompson, 394 U.S. 618, 627 n. 6, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Griffin v. Illinois, 351 U.S. 12, 18, 76 S.Ct. 585, 100 L.Ed. 891 (1956). Dunham v. Pulsifer, 312 F.Supp. 411 (D.Vt. 1970). See also Comment, Equal Protection as a Measure of Competing Interests in Welfare Litigation, 21 Maine L.Rev. 175, 177 (1969). *Contra*, Ramsey v. Ciccone, 310 F.Supp. 600, 604 (W.D. Mo.1970) and Harris v. Yeager, 291 F.

Supp. 1015, 1017 (D.N.J.1968) (*dictum*). "* * * [G]overnment action which without justification imposes unequal burdens or *awards unequal benefits* is unconstitutional." (Emphasis added). Hobson v. Hansen, 269 F.Supp. 401, 497 (D.D.C.1967), aff'd *sub nom,* Smuck v. Hobson, 132 U.S.App.D.C. 372, 408 F.2d 175 (1969).

The equal protection clause touches *de facto* as well as *de jure* regulatory classifications. 269 F.Supp. 401, 495–498. See also Michelman, The Supreme Court 1968 Term—Foreward: On Protecting the Poor Through the Fourteenth Amendment, 83 Harv.L.Rev. 7, 19–33 (1969). Although section 252 was not designed as a discriminatory tool, it does produce a *de facto* classification based on wealth, which classification is clearly the creature of state action.

### c. STANDARD OF REVIEW

At least two standards have emerged for testing the constitutional validity of a regulatory classification. The traditional equal protection standard looks simply to the reasonableness of the classification in light of its possible intended purposes. Judged by this standard, a classification is valid if it is not arbitrary and is reasonably related to some permissible legislative or administrative purpose.

Some types of discriminatory classifications, however, are judicially disfavored and consequently are judged against a second more stringent standard of review. This second standard defines a more active judicial stance and under it a regulatory classification can be upheld only when it is necessary in the service of some compelling state interest. The "active" or "compelling state interest" test requires:

(a) * * * that the challenged classification be strictly relevant to whatever purpose is claimed by the state to justify its use, and also that it be the fairest and least restrictive alternative evidently available for the pursuit of that purpose ("necessity"); and (b) * * * that the infringement of fundamental interests resulting from the classification's use be outweighed by the claimed state purpose ("compellingness").

Michelman, The Supreme Court 1968 Term—Foreward: On Protecting the Poor Through the Fourteenth Amendment, 83 Harv.L.Rev. 7, 20 n. 34 (1969). When dealing with a *de facto* wealth classification, the traditional test is applicable unless the classification infringes a fundamental or favored interest. See Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), noted in 83 Harv.L.Rev. 118, 119, 120 (1969). See also Dunham v. Pulsifer, 312 F.Supp. 411 (D.Vt. 1970) and cases cited therein.[1]

At stake here is the petitioner's liberty for approximately seven months. In Griffin v. Illinois, the Supreme Court identified as fundamental the rights of the defendant in the criminal process. 351 U.S. at 16–20, 76 S.Ct. 585, 100 L.Ed. 891. See also, Survey Note, Developments in the Law—Equal Protection, 82 Harv.L.Rev. 1065, 1127–1128 (1969). In so doing the Court relied heavily on the fact that paramount among the consequences which flow from a criminal conviction is the possible loss of life and *liberty*. The same fundamental interest in personal liberty which invokes the active equal protection standard as a check on classifications within the criminal process is inherent in prison regulations which affect the relative length of sentence among inmates. In either context, the interest in personal

---

i. Professor Michelman makes the observation that while *de jure* wealth classifications are always "suspect" and judged by the "compelling state interest standard", the *de facto* wealth classification does not come within this "inner circle" unless its

creation involves the infringement of separate fundamental rights. Michelman, The Supreme Court 1968 Term—Foreward: On Protecting the Poor Through the Fourteenth Amendment, 83 Harv.L. Rev. 7, 20–22 (1969).

liberty is at the crux of the infringement, and that interest must be deemed fundamental.

■ Although not entirely defeated, the poor prisoners access to worktime reductions are in fact materially impaired by the no-compensation qualification in section 252. Regulatory classifications which impair important fundamental interests are just as suspect under the equal protection clause as those which foreclose such interests entirely. See Rinaldi v. Yeager, 384 U.S. 305, 310, 86 S.Ct. 1497, 16 L.Ed.2d 577 (1966). The *de facto* wealth classification created by section 252 is subject to the active standard of review. It must therefore be justified by a showing that it is necessary in the service of some compelling state interest.

### d. JUSTIFICATION

■ The evidence introduced at the hearing failed to indicate the nature of the governmental objection sought to be achieved by the no-compensation condition in section 252. I can only surmise that it may have been included to discourage inmates from seeking the compensable jobs. Even if we assume this objective, there is little or no reasonable relation between any permissible purpose and the regulatory classification created by section 252. The evidence at the hearing indicated that about 50 compensable jobs were available in the prison industries of which only 20 were actually filled. This lack of demand for remuneration is understandable. The minimal nature of the hourly compensation available to inmates would create a demand for these jobs only among the poor. Only the poor would be forced to sacrifice by the implementation of such a negative incentive. If the operational effect of section 252 has any relation to purpose (the creation of a negative incentive), it is an effective relationship only when applied to the poor inmates. Such a discriminatory governmental purpose is impermissible even if its con-nection with the questioned classification is logically secure. A classification can never be valid because it is rationally related to the purpose of promoting inequality. Note, Developments in the Law-Equal Protection, 82 Harv.L.Rev. 1065, 1081 (1969). See also, Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

■ The classification created by section 252 cannot be justified even under a traditional equal protection standard. See F. S. Royster Guano Co. v. Virginia, 253 U.S. 412, 40 S.Ct. 560, 64 L.Ed. 989 (1920); Dunham v. Pulsifer, 312 F.Supp. 411, at 416–417 (D.Vt. 1970). It follows that the state has failed to show the necessity of the classification in the service of a compelling state interest.

Classifications similar to the instant one, and equally suspect, have been upheld because they have been balanced by an adequate justification. The bail requirement, for example, draws lines of discrimination between the rich and poor. However, bail statutes are highly related to a strong, permissible, governmental interest (the appearance of the arrestee at trial). Rigney v. Hendrick, 355 F.2d 710, 715 (3d Cir.), cert denied, 384 U.S. 975, 86 S.Ct. 1868, 16 L.Ed.2d 685 (1965). See also United States v. Jones, 403 F.2d 498 (7th Cir. 1968), cert. denied, 394 U.S. 947, 89 S.Ct. 1280, 22 L. Ed.2d 480 (1969).

Even in light of this strong state interest, however, the bail or confinement alternative has been severely criticized as inconsistent with the guarantee of equal protection made to the poor in Griffin v. Illinois. Pannell v. United States, 115 U.S.App.D.C. 379, 320 F.2d 698, 700–702 (1963) (Bazelon, C. J., dissenting); Comment, Indigent Court Costs and Bail: Change Them to Equal Protection, 27 Md.L.Rev. 154, 164–168 (1967) and Case Note, 79 Harv.L.Rev. 844 (1966). See also Foote, The Coming Constitutional Crisis in Bail, 113 U.Pa.L. Rev. 1125 (1965).[2]

---

2. Some further guidelines may result from a final decision by the Supreme Court in

Williams v. Illinois, 41 Ill.2d 511, 244 N.E.2d 197, prob. juris. noted, 396 U.S.

**678**

It may be that the justification for bail statutes, generally, is strong enough to offset the obvious burden they impose upon the poor just as a free society may have to expect many regulatory classifications which place greater burdens upon the poor than upon the rich in order to maintain its viable structure. However, where, as in this case, the life patterns of an isolated segment of society are highly regulated by the state, discriminatory classifications within that segment based on pecuniary circumstances are difficult to justify.

### e. CONCLUSION

█ I find that the State has not carried the substantial burden of justification imposed on it by the *de facto* classification created in 28 V.S.A. § 252 (Supp.1969). That part of section 252 which conditions work-time reductions on the performance of such work without compensation is unconstitutional and I hereby declare it to be so.

1036, 90 S.Ct. 689, 24 L.Ed.2d 680 (U.S.Sup.Ct. Jan. 19, 1970), set for arg., 38 U.S.L.W. 3897 (U.S.Sup.Ct. April 1970).