Edwin **DOSTERT**, Individually and as parent and natural guardian of Mark Dostert, a minor, and Mark Dostert, Plaintiffs,

v.

**BERTHOLD PUBLIC SCHOOL DISTRICT NO. 54 et al.,**
Defendants.

No. A4–74–21.

United States District Court,
D. North Dakota,
Northwestern Division.

March 12, 1975.

Tom P. Slorby of Funke & Eaton, Minot, N. D., for plaintiffs.

Orlin W. Backes of McGee, Hankla, Backes & Wheeler, Ltd., Minot, N. D., for defendants.

## MEMORANDUM AND ORDER

VanSICKLE, District Judge.

This action wherein the Plaintiffs seek injunctive and declaratory relief was initiated by the filing of a complaint on April 2, 1974.

Federal jurisdiction is claimed under 28 U.S.C. § 1331 and § 1343; a cause of action is asserted under 42 U.S.C. § 1983 and § 1988 for alleged violations of the Ninth and Fourteenth Amendments to the United States Constitution.

The gravamen of the complaint is that the Plaintiff Mark Dostert is prohibited from engaging fully in certain extracurricular activities at his school because of his refusal to comply with the hair policy adopted by the Superintendent and the Board of Education, the Defendants.

The matter was heard by the Court on March 5, 1975, at Minot, North Dakota. The Court, having heard the evidence, makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

This Court has jurisdiction pursuant to the provisions of 28 U.S.C. § 1343.

The separate Plaintiff Mark Dostert, a minor of the age of 15 years, is a regularly enrolled student in the public high school operated and maintained by the Berthold Public School District No. 54; and the separate Plaintiff Edwin Dostert is the natural father of Mark Dostert and is a patron of Berthold Public School District No. 54.

Berthold School District No. 54 is a school district organized and existing pursuant to the laws of the State of North Dakota and operates and maintains a public high school in the City of Berthold, Ward County, North Dakota; and such school district is operated and maintained by and from funds and revenue realized from various sources of public taxation.

The separate Defendant Larry Grindy is the duly appointed and serving Superintendent of the public schools operated by Berthold School District No. 54. The separate Defendants Julian Neshem, Gerald Thiel, Delwin Deaver, Richard Mush and Maynard Jacobson are the duly elected and serving members of the Board of Education in Berthold Public School District No. 54. The acts complained of by the Plaintiffs were performed by the individual Defendants in the performance of their official duties.

The Plaintiffs have waived their claim for monetary damages; so the only remaining determination is whether the hair policy adopted by the Defendants should be declared unconstitutional and whether the Defendants should be enjoined from enforcing it against the Plaintiff Mark Dostert.

In January, 1974, members of the Board of Education adopted a written "Hair and Dress Policy" for Berthhold Public School.[1]

As it applies in this case, the policy prohibits male students whose hair does not conform to certain guidelines from taking part in the public performances of extracurricular organizations; i. e., unless a boy's hairline falls "above the ears, above the eyebrows and off the shirt collar", he cannot participate in any athletic competition against another school, nor represent the school's FFA (Future Farmers of America) Chapter, nor publicly perform with the band or choir.

Prior to the school board's adoption of the written policy in January of 1974, school officials had an unwritten hair policy (identical to the written policy) which was enforced simply by telling a non-complying student to get his hair cut. But, as of January of 1974, the policy was reduced to writing, and enforcement provisions were adopted which excluded non-complying students from public performances of extracurricular organizations.

After the school board adopted the written policy, Defendant Grindy, the Superintendent, announced it to the students of Berthold Public School in a general assembly sometime in January of 1974.

Plaintiff Mark Dostert let his hair grow during the summer of 1973. On numerous occasions during the fall and

---

1. Hair and Dress Policy of Berthold Public School. This policy shall carry the following points:

1. Shall apply to varsity, junior varsity and junior high football, basketball and track teams.

2. Shall apply to representing our FFA Chapter away from school in any FFA activity.

3. Shall apply to band and choir, so as to include any and all solo's or sub groups that meet or perform outside the school day. A satisfactory music credit may be obtained by attending rehearsal during the school day.

4. Concerning hair length, this policy shall mean above the ears, above the eyebrows and off the shirt collar for the boys. The manner of dress shall be determined by the school official in charge.

winter of 1973, he was told by Defendant Grindy to cut his hair, since it was in violation of the unwritten policy then in effect. On each occasion Mark trimmed his hair, but he did not trim it completely from over his ears in accordance with the school policy.

Mark received some kidding from his classmates as a result of his hair style. On November 29, 1973, an incident occurred in which a number of senior boys wrestled Mark to the floor of the vocational agriculture shop and started cutting his hair with a scissors. The incident was reported to the sheriff's office by Mark and his parents, and the students were reprimanded by Superintendent Grindy.

On or about January 26, 1974, shortly after the school assembly at which the written policy was announced to the students, Mark was playing at a basketball game with the school band and was told by Defendant Grindy that he could not play with the band after that performance; he was also told to report to the Superintendent's office the following Monday. It was at the basketball game or in the Superintendent's office that Mark was told that he could no longer participate in the public performances of any extracurricular organizations.

Prior to this time, Mark had been a participant in athletic programs at the school and had been a member of the FFA and the band. On or shortly after January 26, 1974, however, Mark's participation in these activities was substantially curtailed. Mark was allowed to practice with the athletic teams and the band, and allowed to be a member of the FFA; but he could not represent or perform with any of these groups in public. It is conceded that the sole reason for Mark's partial suspension from participation in extracurricular activities was his failure to comply with the school hair policy.

It should be noted that there was uncontradicted testimony that the length of Mark's hair at the time of the trial was the longest it has been since he began violating the school's hair policy. His hair was clean, well-groomed and neat. The only violation of the hair policy was the way his hair fell over his ears so that only the very bottom of his ear lobes would show.

Defendants, cognizant of their burden of showing justification for their hair policy, presented several reasons.[2] Essentially, four justifications were presented:

1. Since students have no constitutional right to participate in extracurricular activities, as opposed to academic programs, a school can impose a hair policy as a condition of participation;

2. The band director and the FFA adviser asserted that judges in band and FFA contests might take long hair into consideration in marking down the school in general appearance;

3. The basketball coach asserted that long hair can interfere with one's play on the basketball court;

4. The football coach (and the basketball coach to some degree) asserted that a hair policy was necessary in building successful athletic teams, in that it contributed to the discipline, dedication and unity of team members.

■ Our starting point must be the Eighth Circuit opinion in Bishop v. Colaw, 450 F.2d 1069 (8th Cir. 1971). It was in that case that this Circuit recognized that a student possesses "a constitutionally protected right to govern his appearance while attending public high school." *Bishop* at 1075.[3] Once a student has established that a school rule infringes upon his right to govern his

---

2. No health or safety reasons were advanced for the hair policy.

3. The Circuits have divided sharply on this issue. The First, Third, Fourth, Seventh and Eighth Circuits recognize the right, while the Fifth, Sixth, Ninth and Tenth Circuits find the right too insubstantial to warrant federal court consideration. See Massie v. Henry, 455 F.2d 779, 781–83 (4th Cir.

personal appearance, however, the inquiry concerning the constitutionality of the challenged rule does not end. "Personal freedoms are not absolute; they must yield when they intrude upon the freedoms of others. Our task, therefore, is to weigh the competing interests asserted here. In doing so, we proceed from the premise that the school administration carries the burden of establishing the necessity of infringing upon [a student's] freedom in order to carry out the educational mission of the [school]." *Bishop,* 1075–76.

### 1.

Defendants first attempt to justify the hair policy by asserting that, since it is enforced merely by prohibiting violators from fully participating in extracurricular activities—and not by expelling or suspending them from any classes—the constitutional rights of the students are not violated. Participation in extracurricular activities is labelled by the Defendants as a privilege. Thus, since students have no right to participate in extracurricular activities in the first place, it is argued that they can be prohibited from participating in them because they fail to comply with the hair policy. This "right-privilege" argument misses the point. The Plaintiffs' constitutional challenge of the hair policy cannot be answered by an argu-

ment that participation in extracurriculars is a privilege and not a right.[4] Regardless of whether participation in extracurriculars is a "privilege" or a "right", it is still a fact that, in excluding Mark from fully participating in extracurriculars because of his long hair, the Defendants are infringing upon his constitutional right to govern his own appearance. The right of a student to govern his own appearance applies to all school-controlled activities, and not just to school academic programs. Long v. Zopp, 476 F.2d 180 (4th Cir. 1973) and Dunham v. Pulsifer, 312 F.Supp. 411 (D.Vt.1970).[5]

### 2.

Insofar as Mark's participation in the school band and the FFA is concerned, the Defendants contend the hair policy is justified by the fact that Mark's hair might cause the school to be marked down for general appearance in band competitions and FFA contests.

With regard to the school band, the Defendants submitted into evidence an official publication of the North Dakota High School Activities Association showing that "Stage Presence and Appearance" is a factor in the judging of band competitions. The band director could not recite any specific instance where a band had actually been marked down because any of its members had

1972) and Stull v. School Board, 459 F.2d 339, 346–47 (3rd Cir. 1972). The Eighth Circuit has reaffirmed its position in Torvik v. Decorah Community Schools, 453 F.2d 779 (8th Cir. 1972).

4. That argument was emphatically answered by the Supreme Court in Cafeteria Workers v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961), rehearing denied 368 U.S. 869, 82 S.Ct. 22, 7 L.Ed.2d 70, when it said that the question of whether "summarily denying Rachel Brawner access to the site of her former employment violated the requirements of the Due Process Clause of the Fifth Amendment . . . cannot be answered by easy assertion that, because she had no constitutional right·to be there in the first place, she was not deprived of liberty or property by the Superintendent's action. 'One may not have a constitutional right to

go to Baghdad, but the Government may not prohibit one from going there unless by means consonant with due process of law.'" Id. at 894, 81 S.Ct. at 1748.

5. See also *Torvik,* supra, note 3. Although the district court's opinion in *Torvik* is not reported, a review of the trial record shows that a preliminary injunction was entered enjoining the school authorities from enforcing hair regulations against the plaintiffs by excluding them from academic classes or from extra-curricular activities. A motion to modify the preliminary injunction insofar as it applied to extra-curriculars was denied, reasoning like that of *Bishop* being applied to extracurricular activities as well as academic programs. See Torvik v. Decorah Community Schools, Civil No. 70–C–527–EC (N.D.Iowa, Eastern Division).

long hair; he did recite a hearsay opinion, however, that this was something very subjective with the judges and that they might take long hair into consideration in judging a band's overall appearance. We believe that this asserted justification has not been established sufficiently to meet the burden imposed upon the Defendants by *Bishop*.[6]

Alternatively, the school administration has failed to show why this problem could not be solved by imposing a less restrictive rule than requiring students to cut their hair.[7] There was no showing that requiring students to comb their hair under their band caps or requiring them to wear short-hair wigs would not solve the problem of the band's "general presence and appearance."[8]

With regard to the FFA, the Defendants submitted into evidence a copy of the FFA State Code of Ethics, which reads, in pertinent part:

"Hair should be neat, clean, well groomed and of reasonable or moderate length."

Although the school's FFA adviser could point to no specific instance where a participant in an FFA contest had been marked down for his hair length, he voiced the opinion that this might occur and affect the team's score. However, when confronted with Plaintiffs' exhibit of the Oct.–Nov. '74 issue of the National FFA magazine, with the national organization's president on the cover (whose hair style is very comparable to Mark's), the adviser admitted that the FFA Code of Ethics was probably less restrictive than the school's hair policy. He also admitted that Mark's hair was evenly trimmed, so that there is some question as to whether Mark's hair fails to meet the FFA standards of being "neat, clean, well groomed and of reasonable or moderate length." At any rate, the FFA adviser stated that an acceptable short-hair wig would meet his demands. Consequently, the Defendants' contention that the hair policy is justified because the school FFA chapter would otherwise be marked down in contests with other chapters is without merit in the light of *Bishop*'s requirement of "less restrictive rules."

### 3.

■ Insofar as Mark's participation on the basketball team is concerned, the Defendants contend that the hair policy is justified, among other reasons, because long hair can interfere with one's play. The basketball coach testified that, although he had no objection to hair covering the ear, the line had to be drawn somewhere; at some point long hair would interfere with play. However, the coach admitted that hair bands would solve this problem; and, since this would be a less restrictive rule ac-

---

6. In *Bishop*, one of the justifications asserted by the school board was that hair regulations were necessary to prevent disruptions. In evaluating evidence submitted thereon, the court remarked: "[W]e note that much of the board's case rests upon conclusionary assertions that disruptions would occur without the hair regulations. Although we have construed the evidence most favorably to the trial court's findings in support of the regulations' validity, it is apparent that the opinion testimony of the school teachers and administrators, *which lacks any empirical foundation*, [emphasis added] likely reflects a personal distaste of longer hairstyles, which distaste is shared by many in the older generation." Id., 450 F.2d 1076. Here, the band director's testimony is so lacking in "empirical foundation" as to be an insuffi-

cient ground upon which to deny Mark his right to govern his own appearance.

7. Not only does the school administration have the burden of advancing justifications in support of hair regulations which bear at least a rational relation to the length of a student's hair, but it must also show why the particular problems cannot be solved by imposing rules less restrictive than requiring the cutting of hair. *Bishop* at 1077. See also Crews v. Cloncs, 432 F.2d 1259, 1266 (7th Cir. 1970); Stull v. School Board, supra, note 3, 459 F.2d at 347; and Massie v. Henry, supra, note 3, 455 F.2d at 783.

8. We realize that our decision runs counter to Corley v. Daunhauer, 312 F.Supp. 811 (E.D.Ark.1970). That case, however, was decided prior to *Bishop*; and we feel it is inconsistent with *Bishop*.

complishing the same purpose, *Bishop* dictates that this asserted justification for the hair policy must also fail.

4.

The most substantial justification for the hair policy advanced by the Defendants is that, insofar as athletics is concerned, it is necessary in building successful teams. A hair policy is' said to contribute to the discipline, dedication and unity of an athletic team.

The football coach testified to the effect that, if everyone sacrifices the right to determine his own appearance, the team will be that much more dedicated and unified. Teamwork will be enhanced. Everyone on the team will feel equal and become more integrated into the team. The team will have a high morale and be more spirited. On the other hand, if someone can get away with breaking a rule, the other team members will lose respect for the coach and question why they themselves should sacrifice for the team. Thus the rule itself becomes more important than its actual content.

*Bishop* has nothing directly to say about this asserted justification.[9] So we must resort to the weighing process set out in *Bishop*; that is, we must weigh Mark's interest in governing his own hair length with the school's interest in the extra degree of success its athletic programs might enjoy if all team members were more disciplined and dedicated as a result of having uniform hair lengths.

■ To weigh these competing interests, we must state the scale to be used. The school administration carries the burden of establishing *the necessity of infringing upon Mark's freedom in order to carry out its educational mission. Bishop*, 450 F.2d 1075–76. The Defend-

ants have more than the mere burden of showing that requiring uniformity of hair length is rationally related to obtaining an extra degree of success for their athletic programs. They must show that requiring uniformity of hair length is *necessary* to obtain an extra degree of success, and that their interest in obtaining this extra degree of success is such a compelling part of the public educational mission as to outweigh Mark's constitutionally protected interest in determining his own hair length.[10] We do not think the Defendants have met their burden.

There are conjectures by the football coach (and the basketball coach to a lesser extent) that an extra measure of athletic success will result from requiring all the members of a school team to have uniform hair lengths. The speculative quality of these opinions, however, brings little weight to the justification.

Even if an athletic team's success could be increased by requiring all its members to have uniform hair lengths, we do not think that winning is such an important interest that it outweighs all others. Winning should not be the "be-all and the end-all." And it certainly should not be of more importance in the educational process than the teaching of toleration of individual differences. "Toleration of individual differences is basic to our democracy, whether those differences be in religion, politics, or life-style." *Bishop*, 450 F.2d at 1077.

"It would be a bit frightening if a naked emphasis on conformity were to prevail in our public schools. Today's high school student will find that the world beyond his graduation is filled with pressures directed toward conformity. He will certainly not be deprived of the experience. While conformity to reasonable rules of conduct is essential, con-

---

9. The *Bishop* court does say that it "cannot accept the argument that uniformity of appearance must be maintained in order to prevent 'polarization' in the [school] student body." Id., at 1077.

10. ´See note 7 and Justice Goldberg's opinion in Griswold v. Connecticut, 381 U.S. 479, 497, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). *Griswold* was cited in *Bishop* in establishing an individual's right to govern his own personal appearance.

formity for its own sake is dangerous . . . ." Dunham v. Pulsifer, supra, 312 F.Supp. at 420.

We recognize that discipline is a trait well worth cultivating in students. We also recognize that, over and above any effect it might have on winning, the inculcation of discipline is a legitimate educational goal and an important element in any athletic program.

"Anyone who has ever played a competitive team sport knows the importance of team discipline. The coach must be able to control within reasonable limits those aspects of a player's behavior which relate to his performance as a contributing member of the team. Training and health rules must be obeyed by all. Conduct at practice sessions must be in precise conformity with schedules and objectives. During the actual competition, the coach's instructions must be accepted without question. The coach's right to regulate the lives of his team members does have limits, however. A coach may not demand obedience to a rule which does not in some way further other proper objectives of participation and performance. It is bootstrap reasoning indeed to say that disobedience of any rule weakens the coach's authority or shows a lack of desire on the part of the competitor thus justifying obedience to any rule however arbitrary.

"If the rule is otherwise reasonable or, if in this case, it advances a compelling governmental interest vested in the school board, then it should be obeyed. But an otherwise arbitrary or unjustified regulatory classification cannot pull itself up by the bootstrap of its own existence. Breen v. Kahl, 419 F.2d 1034, 1038 (7th Cir. 1969)." Dunham v. Pulsifer, supra, 312 F. Supp. at 420.

Thus, we hold that the school has failed in its attempt to justify its hair policy on the ground that it is necessary to the success of its athletic programs.[11]

In summary, the justifications presented by the school administrators fail to demonstrate the necessity of the hair policy. Accordingly, we hold that the hair policy is invalid and enjoin the Defendants from enforcing it against Plaintiff Mark Dostert.

Counsel for the Plaintiffs shall forthwith prepare and submit a form of judgment in conformity herewith.

Costs are allowed to the extent that they be assessed against Berthold Public School District No. 54 only.

---

11. We realize our holding runs counter to Neuhaus v. Torrey, 310 F.Supp. 192 (N.D. Cal.1970). However, that case comes from a district court in the Ninth Circuit, which has held that students challenging hair regulations fail to establish "the existence of any substantial constitutional right . . . being infringed." King v. Saddleback Junior College District, 445 F.2d 932, 940 (9th Cir. 1971). This position, incidentally, was ably argued by Judge Stephenson in his dissent in *Torvik*, supra, note 3. And as a footnote to this opinion I recite again my comments in Bohn v. Richardton Public School District No. 4 and Amann v. Richardton Public School District No. 4, Civil Nos. A1–74–8 and A1–74–12 (Memorandum opinions filed February 26, 1974).

Dress codes developed as curative steps taken by the public school officials to offset the aberrational personal conduct of students which developed in the public educational systems during the decade beginning in 1960. The problem was temporary in nature, we now realize, and, I am sure, was self-resolving as faculty members came to resist the petty duties which the administration of any dress code imposed on them.

The result of treating these controversies as federal constitutional issues is that any formal judicial ruling has some nationwide effect—and sectional and local community attitudes, as we all well know, are the spice of our varied American way of life. And, as the dissent in *Torvik* points out, the judiciary are not blessed with the expertise to evaluate how their imposition of broad rules can and do affect local school administration.

Finally, why this? Why should not local school boards, in the performance of their duties, have the privileges granted any other administrative body and be presumed to have acted in accordance with their authority until an actual abuse of authority is shown?

While this Court is bound by and must obey the mandate of *Bishop*, it is more impressed with Judge Stephenson's views expressed in *Torvik*.